101 P.2d 1027

## TAOS COUNTY BOARD OF EDUCATION et al. v. SEDILLO, Attorney General.

### No. 4507.

Supreme Court of New Mexico.

April 9, 1940.

Filo M. Sedillo, Atty. Gen., and A. M. Fernandez, Asst. Atty. Gen., for appellant.

Floyd W. Beutler, of Taos, for appellees.

SADLER, Justice.

This is a suit for declaratory judgment filed by the Board of Education of Taos County against Filo M. Sedillo, as Attorney General of the State of New Mexico, to test the merits of his refusal to approve proceedings authorizing bond issues for the purpose of erecting and furnishing school buildings in each of four school districts in Taos County, namely, Rural School Districts Numbered 6, 7, 12 and 13. In conformity with the requirements of 1929 Comp., §§ 120-713 and 120-715, both inclusive, a transcript in triplicate of the proceedings in each district was duly prepared by said board of education containing all matters required by § 120-714 including the certificate in the form directed by § 120-713 of no action pending and of no judgment invalidating the right of the county board of education or the respective school districts to issue said bonds.

The transcripts were duly presented to the Attorney General for his examination and approval in order to mature the right to sell the bonds pursuant to the provisions of § 120-715 without the necessity of establishing their validity by court action. The Attorney General declined approval for reasons hereinafter shown. Whereupon the county board of education instituted this suit before the district court of Santa Fe County to have the rights of the parties upon the matters in controversy declared by decree pursuant to the provisions of L.1935, c. 143, authorizing declaratory judgments under the conditions here shown.

In the petition filed the county board of education claimed the Attorney General had withheld approval of the proceedings because of failure to publish in Spanish, in conformity with the requirements of L.1931, c. 150, § 2 (§ 113-103a, N.M.Supl.1938), the resolution mentioned in 1929 Comp., § 120-703, which by § 120-704 is ordered to be published once in a newspaper at least fifteen days before the date set for the election. It is admitted that this resolution was properly published in the English language.

In his answer the Attorney General, agreeing that he disapproved the proposed bond issues in part upon the ground already mentioned, alleged that he also rested his disapproval upon the fact that the petition to initiate the right to issue bonds was not filed with the board of county commissioners as required by 1929 Comp., § 120-702, and that all acts and proceedings required to be done and performed by the board of county commissioners under §§ 120-702 to 120-714, prior to the election itself, were done and performed instead by the board of education of said county. He prayed that the court by its decree determine the validity of the proceedings in view of each of the grounds put forth by him as a reason for his refusal to attach a certificate of approval to said transcripts.

Following the filing of this answer the board of education moved for judgment on the pleadings. Counsel for the respective parties appeared and argued the motion. It was sustained by the trial court and judgment was entered declaring that the defects

relied upon by the Attorney General for withholding approval were irregularities within the curative protection of 1929 Comp., §§ 120-711 and 120-712, and that the election and proceedings in each of said school districts were valid and binding, giving authority unto each district to sell its bonds in the amount and for the purpose authorized. The Attorney General prosecutes this appeal for the revision and correction of the judgment so entered against him.

As appellant, he now concedes that failure to publish in the Spanish language the resolution calling the election as required by § 120-704 is cured by the provisions of § 120-711, authorizing any person or corporation at any time prior to five days preceding the day set for an election, but not afterwards, to attack the validity of the petition asking for the election or the resolution approving said petition, or both, by action in the district court of the county affected, no such attack having been made. White v. Curry County Board of Education, 36 N.M. 177, 10 P.2d 590; White v. Board of Education of Silver City, 42 N.M. 94, 75 P.2d 712; Board of Education v. Patton, 43 N.M. 107, 86 P.2d 277, are cited as justification for this concession. It is insisted, nevertheless, that the determination of the sufficiency of the petition, the adoption of the resolution calling the election and publication of said resolution and of the notice of election, by the board of education of the county rather than by its board of county commissioners, as required by the statutory provisions then in effect and governing,

is fatal. This contention presents the most serious challenge to the validity of the proceedings involved. The Attorney General is content to rest the security of his position upon it. It is agreed that no suit was instituted by any person or corporation attacking the validity of the proceedings within the periods limited by the sections of the School Code presently to be mentioned.

■ The authorities cited above appraising the effect of the limitation provisions contained in §§ 120-711 and 120-712 afford ample warrant for the concession made by the Attorney General respecting the failure to publish in the Spanish language the resolution calling the election. As pointed out, the notice of election required by § 120-705 was duly published in both English and Spanish, giving the date of election, number of the school district, the question to be voted upon, amount of the bond issue sought and the purpose for which bonds were to be issued. Certainly, under the holding in the cases above cited this was an irregularity only and well within the curative effect of § 120-711, if, indeed, the complaint fairly may be taken as alleging facts calling for publication in Spanish.

■ Does a like conclusion follow when we consider that prior to June 10, 1939, effective date of the amendment of § 120-702 by L.1939, c. 183, the county board of education rather than the board of county commissioners performed all duties imposed upon the latter as the law then existed? This is the precise question with which we are confronted. In view of the same au-

thorities cited supra interpreting 1929 Comp., §§ 120-711 and 120-712, and declaring the purpose of these provisions, and particularly in view of the test applied in White v. Board of Education of Silver City, supra; and later approved in Board of Education v. Patton, supra, we are compelled to give an affirmative answer to this inquiry. How those handling the election in these school districts made the mistake of substituting the county board of education for the board of county commissioners is understandable, even if otherwise not excusable. The 1939 legislature by L.1939, c. 183, made the same substitution. Unfortunately, however, for the regularity of the proceedings, the legislature did not attach the emergency clause to the amendatory act. The amendment, therefore, was not in effect, as supposed, at the time the petition was filed nor when the resolution calling the election was adopted. The petitioners for the election, apparently knowing of the amendment, erroneously assumed that it carried the emergency clause.

But by grace of the law this blunder is not now fatal because the validity of the proceedings remained unchallenged on account of it until the time for challenge had passed under the provisions of 1929 Comp., §§ 120-711 and 120-712. In Board of Education v. Patton, 43 N.M. 107, 86 P.2d 277, 278, we had the following to say touching the effect of these sections of the School Code, to-wit: "From the foregoing it appears that the rule adopted with reference to this statute is that mere regulatory provisions of the exercise of the right or power

to borrow money and which do not render the proceedings a nullity are controlled by the limitation statute quoted above."

In White v. Board of Education of Silver City, supra [42 N.M. 94, 75 P.2d 718], quoting approvingly at some length from Weinberger v. Board of Public Instruction, 93 Fla. 470, 112 So. 253, we rather strongly indicated that the statement there made of matters foreclosed by the familiar statutory suit to validate bond issues reflected our view of matters foreclosed by the limitation provisions of our School Code above mentioned. It was held in that case that any matter or thing affecting the power or authority of the several political subdivisions mentioned to issue bonds, or the regularity or legality of their issue, "in so far as those matters or things could be lawfully prescribed, regulated, limited, or dispensed with by the Legislature in the first instance, or subsequently cured by a validating act, may be put in repose by a decree rendered pursuant" to the provisions of the statute authorizing validation by suit. Such is the effect of the language quoted last above from Board of Education v. Patton, supra, as related to these sections of the School Code.

This view of the effect of these limitation provisions was forecast in the very first case calling for their construction following adoption. In White v. Curry County Board of Education, 36 N.M. 177, 10 P.2d 590, 591, we said: "The present attack, if launched in time, would perhaps have been fatal. Dickinson v. Board of Commis-

sioners, 34 N.M. 337, 281 P. 33. But we see no reason for holding that the Legislature could not limit the action as it has. It was within its power to have omitted the petition entirely. Williams v. Van Pelt, 35 N.M. [286], 295 P. 418. See, also, Riverside Park Association v. City of Hutchinson, 102 Kan. 488, 171 P. 2. Elliott v. Tillamook County, 86 Or. 427, 168 P. 77, cited by appellants, we think not in point."

Williams v. Van Pelt, 35 N.M. 286, 295 P. 418, declaring the effect of the curative provisions of our taxing laws upon tax titles, was cited by way of analogy; also, Riverside Park Association v. City of Hutchinson, 102 Kan. 488, 171 P. 2, 3, a case dealing with a statute which fixed a thirty day limitation upon the right to enjoin or contest a special assessment for street improvements, concerning which the court said: "The Legislature manifestly intended to bar an action for every defect, *whether it be for irregularity, or invalidity,* if not begun within the prescribed time. Within that time the plaintiff might have contested the right of the city commissioners to make an assessment on property which the appraisers had not included in their report and also where the taxing district had extended beyond the legal limits. The intention of the Legislature was that public improvements should not be long delayed by contests of this character nor the assessment proceedings interrupted by belated litigation; and so property owners who propose to challenge an assessment for any kind of defect are required to do so promptly or not at all. The validity of such a law is beyond question." (Emphasis ours.)

We employed language very similar to that just quoted concerning our statute in Griggs v. Board of County Com'rs of Colfax County, 39 N.M. 102, 41 P.2d 277, 280. We said: "It is argued as if this were a validating proceeding, such as that contemplated in the irrigation district statute (Comp.St.1929, § 73-249 et seq.), and as if the Legislature had disclosed a studied purpose to have a judicial inquiry and declaration before the election as to the validity of the earlier proceedings. We think the section discloses rather a purpose to foreclose such inquiry; to frown upon, not to encourage, the 'attack'; to permit no one, after the election and when the petition and resolution have served their purpose and become functus officio, to go back of the election disclosing the people's will, and defeat it by attacking the validity of the earlier proceedings."

If the limitation provisions shielded from attack on account of minor irregularities only, they would be of very little worth. Such often are disregarded without the aid of limitation or curative acts. We now hold that, where power resides in school districts to borrow money and issue bonds therefor at all, these statutory provisions, after the time limited, protect the proceedings against attack for invalidity as well as for irregularity, except upon constitutional grounds. 1 Jones on Bonds and Bond Securities, 4th Ed., p. 358, § 347; State ex rel. Board of Education v. Brown,

97 Minn. 402, 106 N.W. 477, 5 L.R.A., N.S., 327; Anderson v. Township of Santa Anna, 116 U.S. 356, 6 S.Ct. 413, 29 L.Ed. 633.

As a matter of fact the record before us discloses that the effective date of the amendatory act caught these proceedings in a half completed stage. The petitions asking that the elections be called were filed May 22, 1939, and the resolution calling same was adopted the same day. The resolution was published June 8th, thereafter, and the amendment became effective two days later, on June 10th. The election was called for and held on June 21st. So that, the performance after June 10th by the county board of education of all duties incident to bond elections theretofore imposed upon the board of county commissioners, was a literal compliance with the statute as amended, to say the least.

■ There can be no doubt of the legislature's power to impose on the county board of education performance of the duties theretofore laid on the board of county commissioners by it in reference to authorization for the issuance of bonds by school districts. As stated, it already had done that very thing when the proceedings here involved were initiated, the existing legislation awaiting only the lapse of time to reach the effective date of the amendatory act. Hence, the power to borrow and issue bonds existing and no constitutional question being raised, we conclude that failure to attack the proceedings within the respective time limits prescribed by §§ 120-711 and 120-712, renders the proposed bond issues invulnerable to the claims of invalidity now urged by the Attorney General in support of his refusal to attach a certificate of approval to the transcript of the proceedings presented to him.

Barry v. Board of Education of City of Clovis, 23 N.M. 465, 169 P. 314, is mainly relied upon by the Attorney General in support of his contention that performance up to June 10, 1939, by the county board of education of the duties of the board of county commissioners justifies his refusal to give an approving opinion. That was a taxpayer's suit to enjoin the defendants from negotiating school bonds authorized at a special election called, held and conducted by the board of education, instead of the city council and mayor, as provided by statute. We do not question the correctness of that decision and should consider it decisive in this case but for a controlling circumstance, viz., the subsequent enactment of the limitation provisions embraced in §§ 120-711 and 120-712. No such legislation had been enacted for the security of school bond issues when the Barry case was decided. It therefore is without binding force as a precedent.

■■ We do not share the view of the minority that school districts in an action upon the bonds after maturity, if in default, may defend and relitigate the same questions previously decided and foreclosed in its favor in proceedings of this nature initiated by it for the purpose of making the bonds marketable. We are unwilling to convict the legislature of having authorized such a result or of even rendering it possible. Nor, do we find anything in Lanigan

v. Gallup, 17 N.M. 627, 131 P. 997, holding that departure from literal compliance with the enabling act adopted under Const. Art. IX, § 11, authorizing school districts to issue bonds, presents a constitutional question. We hold no constitutional question is here presented.

 Having determined upon the merits the errors assigned and argued before us, we turn now to a question not raised by counsel either in this court or in the court below. Indeed, the Attorney General in his answer to the complaint joined in the prayer for a declaratory judgment. Nevertheless, the question is one which, suggesting itself, has caused the court grave concern. It is one of jurisdiction and compels an answer. The question is whether this case presents a justiciable controversy under the declaratory judgments act. It would have been just as pertinent in three former cases already decided by this court had it been raised by counsel or sensed by us. They are Roswell Municipal School District v. Patton, 40 N.M. 280, 58 P.2d 1192; Board of Education of San Juan County v. Patton, Attorney General, 43 N. M. 107, 86 P.2d 277; and Board of Com'rs of Guadalupe County v. State, 43 N.M. 409, 94 P.2d 515.

In the Patton cases, the plaintiffs sought a declaration against the Attorney General after the latter's refusal to approve a transcript of school bond proceedings, just as in the case at bar. In the Guadalupe County case, the Board of County Commissioners sued the state and the state treasurer upon the latter's refusal to complete the purchase of bonds for the remodeling of the Guadalupe County Court House. In none of these cases was the jurisdiction of the court to enter a declaration challenged for want of a justiciable controversy. Nevertheless, for purposes of those cases, at least, we necessarily held each to present a justiciable controversy, and in the Guadalupe County case, in like manner only, that the declaratory judgments act (L.1935, c. 143) operated as a waiver of the state's immunity to be sued without its consent. Under such conditions, none of these cases is stare decisis upon the proposition that a justiciable controversy was present or that the act contains in section 3 a general consent upon the part of the state to be sued under it, a conclusion within the decision in the Guadalupe County case. We take this first opportunity to correct any impression that section 3 of the act is a general consent on the part of the state to be sued under its provisions. We are agreed that it has no such meaning and has no greater effect, in so far as this consideration is concerned, than merely to permit parties to sue the state under the act where the state's consent to be sued otherwise exists and the facts warrant suit.

Two forms of declaratory judgments act seem to have been employed in the adoption of the new remedy in the United States. Practically all of the states enacting it have adopted the uniform act. It will be found set out in the Appendix to Borchard on Declaratory Judgments at pages 625 and 626. New Mexico preferred to adopt, substantially, the federal act, 28 U.S.C.A. §

400. Id., 634. We appropriated, verbatim, its subds. 1 and 2, but in lieu of its subd. 3, relating to jury trials, substituted the section authorizing actions against the state and state officials in certain instances where a construction of the state constitution or a statute is called for. Omitting section 4, the emergency clause, L.1935, c. 143, reads as follows:

"Section 1. In cases of actual controversy, the courts of record of the State of New Mexico shall have power, upon petition, declaration, complaint, or other appropriate pleadings, to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of the final judgment or decree and be reviewable as such.

"Section 2. Further relief, based on declaratory judgment or decree, may be granted whenever necessary or proper. The application shall be by petition to the court having jurisdiction to grant relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party, whose rights have been adjudicated by the declaration, to show cause why further relief should not be granted forthwith.

"Section 3. For the purpose of this act, the State of New Mexico, or any official thereof, may be sued and declaratory judgment entered when the rights, status or other legal relations of the parties call for a construction of the constitution of the State of New Mexico, or any statute thereof."

It is well settled that under the provisions of the uniform act jurisdiction to enter a declaration arises only when there is presented to the court for determination a justiciable controversy. As will be noted, section 1 of our act, following the federal act, limits the power to enter declarations to cases of "actual controversy". The uniform act does not contain these words, although some of the states and territories, following the Michigan decision in Anway v. Grand Rapids Railroad Company, 211 Mich. 592, 179 N.W. 350, 12 A.L.R. 26, holding the first Michigan act unconstitutional, inserted them in adopting the uniform act, notably California, Hawaii, Kansas, Kentucky and Virginia. Many decisions and texts support the conclusion that under section 1 of our act an actual controversy must exist to confer jurisdiction. Borchard on Declaratory Judgments, Ch. II, pages 23 to 50; 16 Am.Jur. 282, § 9, under "Declaratory Judgments"; Aetna Life Ins. Co. v. Haworth, 299 U.S. 536, 57 S.Ct. 190, 81 L.Ed. 395; 108 A.L.R. 1000; Garden City News v. Hurst, 129 Kan. 365, 282 P. 720; Axton v. Goodman, 205 Ky. 382, 265 S.W. 806; County Board of Education v. Borgen, 192 Minn. 512, 257 N.W. 92; Ex parte Eubanks, 202 N.C. 357, 162 S.E. 769; Calcutt v. McGeachy, 213 N.C. 1, 195 S.E. 49; and annotations in 87 A.L.R. 1233, 114 A.L.R. 1361.

There has been great diversity of opinion, however, over the question of just what is an "actual controversy" for pur-

poses of jurisdiction under the act. Interesting discussions of the subject are to be found in somewhat recent articles by Professor Borchard, author of the standard text on Declaratory Judgments. One such article is entitled "Justiciability" and appears in 4 Univ. of Chi.Law Review 1. Another, under the subject "Declaratory Judgments", appears in November, 1939, issue of "Current Legal Thought" (Vol. VI, No. 2, Page 59), a reprint from 9 Brooklyn Law Review 1. Still another by Scroth entitled "Actual Controversy" is to be found in 20 Cornell Law Quarterly, page 1. As pointed out by Professor Borchard in his article in "Current Legal Thought", there has been a reluctance on the part of some of the courts to apply the new remedy. This results in greatly narrowing the field of its operation. He says: "While the magical words 'case' or 'controversy' still afford reluctant judges an opportunity to refuse to pass on particular litigation, the United States Supreme Court has now given even these words, at least in several cases, a relatively broad meaning more in line with Marshall's and Field's conceptions. Coleman v. Miller, 59 S.Ct. 972 [307 U.S. 433, 83 L.Ed. 1385, 122 A.L.R. 695]."

In the very interesting case of. Miller v. Miller, 149 Tenn. 463, 261 S.W. 965, 972, in which was challenged the constitutionality of the declaratory judgments act as adopted in that state, after an extensive review of the authorities, the court sustained the act against all objections urged. In summing up, the opinion gives a very satisfactory statement of jurisdictional requisites. The court said: "It follows, therefore, from the foregoing authorities, that the only controversy necessary to invoke the action of the court and have it to declare rights under our declaratory judgment statute is that the question must be real, and not theoretical; the person raising it must have a real interest, and there must be some one having a real interest in the question who may oppose the declaration sought. It is not necessary that any breach should be first committed, any right invaded, or wrong done. The purpose of the act, as expressed in section 12 thereof, is to 'settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered.' "

Unquestionably, the court in the Miller case was influenced by the decision of the House of Lords in the English case of Russian Commercial and Industrial Bank v. British Bank for Foreign Trade, [1921] 2 A.C. 438, 19 A.L.R. 1101, which is cited in the opinion. The Supreme Court of South Dakota in Security State Bank v. Breen, 65 S.D. 640, 277 N.W. 497, appraises the Miller case as containing the best statement upon jurisdiction under the declaratory judgments act found by it in the books.

Tested by the jurisdictional formula laid down in Miller v. Miller, supra, we think there can be no serious doubt that the facts of this case present an actual controversy. The legislature, as disclosed by Chapter 120 of New Mexico Statutes Annotated (1929) and amendatory acts, has set up a plan complete unto it-

self for the authorized issuance of bonds by school districts. The county board of education (formerly the board of county commissioners) has general supervision of calling the election and canvassing its results. This body, however, is not the only one having to do with maturing the right to issue school bonds. All proposals for the issuance thereof must have the approval in writing of the state board of education. 1929 Comp., § 120-105, as amended by L.1931, c. 119, § 1. This action comes normally as an initial step in the proceedings.

▮ Furthermore, the Attorney General is a very important cog in the machinery provided as evidenced by the present controversy. Under §§ 120-714 and 120-715 the right to issue and sell bonds depends absolutely upon his certificate approving the proceedings as disclosed by the transcript thereof furnished him by the governing authority "unless and until" the validity of such proceedings be established by prior court action. The Attorney General is called upon to attach his certificate of approval or rejection "after careful investigation of the legality of said election and proceedings as shown by said transcript", etc. In withholding the right to issue bonds without the approving certificate prescribed until the validity of the bond proceedings are established by prior court action, the legislature repudiates any idea that the action of the Attorney General should bear the stamp of finality. The word "until" signifies future action.

It is thus made the duty of the Attorney General to check the proceedings and approve or reject, accordingly as he finds compliance with statutory requirements or non-compliance in a fatal respect, i. e., as to a requirement not within the protection of the limitation provisions set forth in §§ 120-711 and 120-712. That the legislature intended the Attorney General should consider these sections of the School Code in granting or withholding approval is fairly demonstrated by the requirement of § 120-714(9) for the inclusion in the transcript of the district clerk's certificate of "no action pending" authorized by § 120-713.

The legislature could have made final the Attorney General's opinion in relation to this special duty by clothing him with quasi-judicial powers. We find no indication that it has done so. On the contrary we find much to indicate otherwise. His certificate of approval obviously is not final. None would question the right of any litigant possessing the necessary interest to sue to enjoin issuance of the bonds, notwithstanding an approval. In such a suit the correctness of the opinion would be drawn in question and passed upon. Why any distinction? No good reason suggests itself for leaving his approval open to judicial review in a suit to enjoin and denying to his disapproval a like review in some appropriate action. The legislature could not have intended such an incongruous result.

▮ We think the duties of the Attorney General are ministerial and sub-

ject to control by mandamus. The situation is somewhat akin to that disclosed in Lorenzino v. State, 18 N.M. 240, 135 P. 1172, where mandamus was held to be an appropriate remedy. The board of county commissioners necessarily had to determine existence of the facts calling for cancellation of the license involved. This exercise of judgment by the board was held not to detract from the ministerial character of the duty imposed. Hence, mandamus was awarded to control the board's action. So, too, in the case at bar the due performance of his statutory duty in the premises requires the Attorney General to exercise judgment in determining the facts upon which his action is to be based. In so informing himself, as said of the board in the Lorenzino case, he does not act judicially. Having determined the facts, there can be but one course open to him, viz., to declare the law correctly on those facts—a pure question of law.

Wood v. Strother, 76 Cal. 545, 18 P. 766, 767, 9 Am.St.Rep. 249, a leading case, contains an excellent statement of the law applicable to the situation presented in the case at bar. Mandamus was sought to compel the auditor to countersign a street assessment warrant. The governing act provided that before countersigning the auditor must "examine the contract, the steps taken previous thereto, and the record of assessments, and must be satisfied that the proceedings have been legal and fair". The usual objections to the propriety of mandamus were interposed; that

the auditor having satisfied *himself* the proceedings were not legal, even though admittedly wrong in his conclusion, had simply committed error in a matter confided to his discretion which mandamus was powerless to control; that the writ could not be used to perform the function of a writ of error; that it could compel action in *some* way but not in a *particular* way, and so forth. The court said the argument was exceedingly plausible; that the rule—which was undoubtedly correct when properly understood—had been expressed in various forms. Numerous cases were reviewed, following which the court concluded:

"In view of the foregoing cases, it seems a mere perversion of language to say that the writ will never issue to control judicial action, or to compel a tribunal to act in a particular way. It is by no means intended to assert that the writ could issue in this state in all the cases above referred to. The propriety of the issuance of the writ in any case must depend upon whether, under the law of the state where the litigation arises, the determination was intended to be final; and, if not, upon whether the system of practice furnishes any other adequate remedy. These things might be different in different states. But the cases cited serve to show that the formulas above mentioned are not universally and literally true, and that it is dangerous to reason from them as if they were so. In every case the tribunal that is to act must determine in the first instance whether the case is a proper one for its action.

And in our opinion the true tests are whether its determination is intended by law to be final, and, if not, whether there is any other 'plain, speedy, and adequate remedy.' *If the determination of the tribunal was intended to be final, it is plain that it cannot be disturbed, either on mandamus or in any other way. If it was not intended to be final, but there is another 'plain, speedy, and adequate remedy,' the writ cannot issue; for it was not designed to usurp the place of other remedies. But if the determination was not intended to be final, and there is no other adequate remedy, the writ must issue. Otherwise there would be an admitted wrong without a remedy. * * **

"It will generally happen that where discretion is committed to an officer, or where a judicial tribunal is called upon to act, its determination is either final, or only subject to review in certain prescribed ways. But, as above shown, this is not universally true, and it is dangerous to reason as if it were so. The ultimate test is, in our opinion, as we have stated." (Emphasis ours.)

State ex rel. Griffith v. Board of Com'rs of Linn County, 113 Kan. 203, 213 P. 1062, 1063, is a case in its facts much like the one before us. The County Attorney and county commissioners were sued in mandamus involving certain road contracts. The statute imposed upon the County Attorney duties in reference to the contracts no different in effect from those laid upon the Attorney General in New Mexico in reference to a proposed issue of school bonds. The same defenses were interposed to mandamus as are suggested touching its propriety as a remedy on the present facts, had it been sought. The court very clearly points out the inapplicability to similar facts of the time honored rule that the writ will not lie to control discretion. It said:

"The bridge statute contains this provision:

" 'That it is hereby made the duty of the county attorney to personally examine as to form, the advertisement, proposal, contract, plans, specifications, bond and the minutes of the board's meeting for each bridge or culvert proposed to be built or repaired by contract, to determine whether the contract has been awarded in strict compliance with this act; and no contract shall be legal and binding on the county until said contract is signed by the chairman of the board of county commissioners, by order of said board at a legal meeting thereof, and approved by the county attorney by his signature indorsed thereon.' Laws 1917, c. 80, § 18.

"The occupant of the office of county attorney at the time the contracts were executed did not believe that the bridge laws had been complied with, and made an indorsement upon each to that effect. The defendants urge that it was incumbent upon the officer to act upon his own judgment, and that his action cannot be controlled by mandamus, and that in any event the present county attorney has no duty

to perform in the matter. The obvious intention of the statute is that the county attorney shall pass upon the legality of the proceedings involved, and not upon any question of business expediency. *Where, as here, the problem is one of applying the law to established facts, an officer who must in the first instance pass upon the question may be required to take another course where the court reaches a different conclusion upon the legal issue.* For illustration, mandamus will lie to require the auditor of state to allow a claim in spite of his prior disapproval, where it was based upon what is found to be a mistaken view of the law.

" 'Where they (the defendants in mandamus) seek to justify nonaction on their part solely by a reason which is founded upon a doubtful conception of their legal obligations—where the controversy grows out of a dispute over a pure question of law, an authoritative answer to which will necessarily end the matter—the practice in this state is to permit the issue to be determined in mandamus. * * *' Construction Co. v. Sedgwick County, 100 Kan. 394, 396, 164 P. 281, 282." (Emphasis ours).

See, also, Houston & G. N. Railroad Company v. Kuechler, Commissioner of General Land Office, 36 Tex. 382 and 400 (two opinions); Tarrant County Water Control Company & Imp. Dist. No. 1 v. Pollard, Attorney General, 118 Tex. 138, 12 S.W.2d 137; Giles v. City of Houston, Tex.Civ.App., 59 S.W.2d 208.

In the Pollard case, on all fours with this one, the supreme court of Texas held mandamus the proper remedy where the Attorney General's refusal to approve a bond issue was based upon the decision of an intermediate court of appeals (later reversed by the supreme court), holding the enabling act invalid.

In Houston & G. N. Ry. Co. v. Kuechler, supra, the court said: "We can see no reason why the propriety of issuing the writ of *mandamus,* in any proper case, to the Commissioner of the Land Office, or to any other officer of the State government, should ever have been brought into question. It is said that an officer cannot be compelled by a *mandamus* to do any act involving an exercise of official discretion. This is very true, when properly understood. It means that an officer cannot be compelled by *mandamus* to do anything which the law gives him a discretion not to do. It does not mean that the writ will not issue to compel an officer to do any act the performance of which requires an exercise of mind or judgment, such, for example, as the identification of an individual."

We entertain no doubt that the duty of the Attorney General in the premises is ministerial and that upon the agreed facts of the instant case mandamus would have been a proper remedy against him by the county board of education. The conclusion follows as a matter of course that under L.1935, c. 143, § 1, an actual "case" or "controversy", justiciable in character,

is present warranting suit for a declaratory judgment.

Having so concluded, it becomes unnecessary for us to determine whether section 3 of our act, not found in the uniform and federal acts, constitutes an enlargement of the jurisdiction to enter declaratory judgments in certain instances where the state or a state official is the defendant and the construction of the state constitution or a statute is called for. On the one side it is argued that if not an enlargement of jurisdiction, its presence in the act is meaningless, suit against the state or state officials in the instances enumerated being maintainable under section 1 without the aid of section 3.

Some of the following cases decided under a liberal construction of the declaratory judgments act as adopted in various states, without the presence of any equivalent of our section 3, might be deemed non-justiciable here unless possibly by virtue of it: State ex rel. Sullivan, Attorney General v. Price, 49 Ariz. 19, 63 P.2d 653, 108 A.L.R. 1156; State ex rel. Miller, Att'y. Gen. v. State Board of Education, 56 Idaho 210, 52 P.2d 141; Local Union No. 26 v. City of Kokomo, 211 Ind. 72, 5 N.E.2d 624, 108 A.L.R. 1000; Muskegon Heights v. Danigelis, 253 Mich. 260, 235 N.W. 83, 73 A.L.R. 696; School Dist. of Kansas City v. Smith, State Auditor, and McKittrick, Attorney General, 342 Mo. 21, 111 S.W.2d 167; Merchants Mut. Casualty Co. v. Kennett, N.H., 7 A.2d 249; Dun & Bradstreet v. City of New York, 276 N.Y. 198, 11 N.E.2d 728; Board of Education v. Van Zandt, 119 Misc. 124, 195 N.Y.S. 297, affirmed without opinions, 204 App.Div. 856, 197 N.Y.S. 899 and 234 N. Y. 644, 646, 138 N.E. 481; Craig v. Commissioners of Sinking Fund, 208 App.Div. 412, 203 N.Y.S. 236; Wingate v. Flynn, 139 Misc. 779, 249 N.Y.S. 351, affirmed without opinion, 256 N.Y. 690, 177 N.E. 195; Redmond Realty Co. v. Central Oregon Irr. Dist., 140 Or. 282, 12 P.2d 1097.

On the other hand it is said that instead of enlarging, section 3 limits jurisdiction; that its purpose is twofold: First, to remove any doubt about applicability of the act to the state and state officials where consent on the part of the state to be sued otherwise exists; and, second, to limit the right to have declarations, even in those instances, subject to the conditions named, to cases involving the construction of the state constitution or of some statute. We pass the question. Any present declaration we might make upon the subject would be gratuitous in view of the fact that we find jurisdiction to exist under section 1.

We take occasion before closing this opinion to acknowledge appreciation to. Honorable A. M. Fernandez, Assistant Attorney General, and Honorable Floyd W. Buetler, counsel for the respective parties, for the helpful briefs filed by them pursuant to our request upon the question of jurisdiction under the declaratory judgments act. It was first raised by us. Their briefs review many authorities and present able discussions of a question that is new to our jurisdiction.

Finding no error the judgment of the trial court is affirmed.

It is so ordered.

BICKLEY, C. J., and ZINN and MABRY, JJ., concur.

BRICE, Justice (dissenting).

Section 11 of Article 9 of the State Constitution provides: "No school district shall borrow money, except for the purpose of erecting and furnishing school buildings or purchasing school grounds, and in such cases only when the proposition to create the debt shall have been submitted to the qualified electors of the district, and approved by a majority of those voting thereon. * * *"

If not a grant of power, it is a limitation that prohibits such districts from incurring indebtedness unless certain formalities are followed. This court considered the precise question in Lanigan v. Gallup, 17 N.M. 627, 131 P. 997, 999, except that it had reference to the authority of cities and towns to incur such indebtedness. We stated:

"The limitations contained in said sections upon the debt-contracting power of such municipalities are certainly self-executing. * * *

"Under section 12, before such debt can be incurred, the question must first be submitted to a vote of the qualified electors of such municipality, who have paid a property tax therein during the preceding year. *By whom, or what board or body, is the question to be submitted? No provision is made as to any notice to be given the electors that such a question will be submitted. While such question must be determined by ballot, deposited in a separate ballot box, no provision is made as to what said ballot shall contain, or how the voter shall express his desire. How is the vote to be canvassed,. and to whom shall the return be made?* Again, when it comes to issuing the bonds, for what length of time shall they run? *Who is to execute the bonds?* What rate of interest shall they bear? In what denominations shall they be issued? How shall they be sold? If it be argued that many of these questions are already provided for by existing laws, such argument would only tend to demonstrate that the provisions in question are not self-executing; for it would be evident that it was necessary to supplement such provisions by law, and all the reasoning advanced for sustaining the validity of the bonds in this case would fall.

"Here no contention is made that the town authorities complied with the *existing statutes* upon the subject; but the broad claim is made that it is unnecessary to comply with any of the statutory provisions theretofore existing and continued in force by the Constitution, because 'the constitutional provisions were self-executing and provided a full and complete method of procedure, and in and of themselves authorized the creation of the indebtedness. We do not think the provisions in question are self-executing, but legislation ' is nec-

essary for the enjoyment of the rights given." (Emphasis mine.)

The effect of this decision is that the limitation on the power to contract debts, contained in the Constitution, is self executing; but the grant of power to contract (if it is such grant) is not self executing, "but to make them operative legislation is necessary." As I understand the opinion, in the absence of legislation providing for an election, which must be followed, the authority to issue bonds at all is denied. The legislature enacted such statutes, and they were ignored through mistake.

Provision is made for the calling of the election, the form of ballot, the appointment of election judges, delivery of the ballot boxes, certification of the result of the election by the judges, and the canvass of the vote *by the authority calling the election*, and its certificate of the result, none of which were followed.

If, as we said in the Lanigan Case, these statutes are "necessary to the enjoyment of the right given," does it not follow that the failure to utilize them is as fatal to the power as the failure to enact them? In other words, the power to thus contract is dependent upon whether the interested electors have expressed their approval at an election held under statutes enacted to vitalize the power to issue bonds; that is, at an election provided for that purpose by law. That was the effect of our decision in the Lanigan case and in Barry et al. v. Board of Education of Clovis, 23 N.M. 465, 169 P. 314, 315, in which it was held

that a like election was without authority of law and void. This court stated: "From the foregoing authorities it is apparent that the election in question was called and notice thereof given by the wrong agency, and the bonds authorized by such election are invalid."

This seems to be admitted, but it is said that since those decisions were handed down, certain statutes have been enacted that have the effect of validating or "curing" invalid bonds; vitalizing something that never lived or could live, according to my construction of the higher and controlling law.

These statutes are as follows:

"Any time prior to five days preceding the day set for an election, but not afterwards, any person or corporation may attack the validity of the petition asking for the election or the resolution approving said petition, or both, by action in the district court of the county of the district affected and the court shall have power to require appearance and answer therein in such time as it shall elect. All such cases shall take precedence over all other court business." Sec. 120-711, N.M.Sts.1929.

"Any person or corporation may institute in the district court of the county of the district affected an action or suit to contest the validity of all proceedings taken subsequent to those mentioned in the last preceding section, but no such suit or action shall be maintained unless the same be instituted within ten days after the publica-

tion of the certificate specified in section 709 * * * hereof." Sec. 120-712, Id.

We have held that these are statutes of limitation, Board of Education, etc., v. Patton, 43 N.M. 107, 86 P.2d 277, and cases cited therein; that the words "any person or corporation" as used in these statutes, do not enlarge the class of those "who, having legitimate ends to accomplish or rights to protect, without this statute would have been qualified to seek the aid of the courts," Griggs v. Board of County Com'rs, 39 N.M. 102, 41 P.2d 277, 280; that they foreclosed the right of questioning the validity of a proposed bond issue upon the ground that the petition, notice and ballot submitted a double proposal, White v. Board of Education, 42 N.M. 94, 75 P.2d 712, 716, but we were careful to say "the objection points out no constitutional defect in the proceedings and, if valid, should have been urged within the time limited by the statute." We have held that where the petition for an election had been changed after it was signed, that the limitation statutes effectively prevented an attack upon the bonds because it was within the power of the legislature to have omitted the petition altogether, White v. Board of Education, 36 N.M. 177, 10 P.2d 590; we held in Board of Education v. Patton, supra: "That the rule adopted with reference to this statute is *that mere regulatory provisions* of the exercise of the right or power to borrow money and *which do not render the proceedings a nullity* are controlled by the limitation statute quoted above." (Emphasis mine.)

The above was the last pronouncement of this court on the question; and correctly states the law.

That the election was absolutely void there can be no question. Barry v. Board of Education, supra; Seaboard Airline R. Co. v. Townsend, etc., District, 44 Ga.App. 705, 162 S.E. 837; Marshall County v. Cook, 38 Ill. 44, 87 Am.Dec. 282. The distinction is that mere defects or irregularities in bond elections do not necessarily invalidate the bonds, but if the election is ordered by a person or tribunal having no authority, the whole proceeding is absolutely void and every subsequent step is void, and incapable of ratification.

"There is no inherent right in the people, whether of the state or of some particular subdivision thereof, to hold an election for any purpose. Such action may be taken only by virtue of some constitutional or statutory enactment which expressly or by direct implication authorizes the particular election. The rule is firmly established that an election held without authority of law is void, even though it is fairly and honestly conducted." 18 Am.Jur. "Elections" Sec. 100.

"* * * it is essential to the validity of the election that it be called and the time and place fixed by the agency designated, and by no other. If not called by the proper officers, such an election is without authority of law, and is void. State Constitutions and statutes have designated, as the proper agencies for the issuing of orders and calls for elections, vari-

ous officers and bodies, such as judges, the county court, and municipal officers. * *" 18 Am.Jur. "Elections" Sec. 101.

Was the failure to hold an election (and the pretended election was no election) immaterial because of the existing limitation statutes? I am satisfied it was not.

The legislature has power to cure defects in proceedings which it might have dispensed with in the first instance, by validating acts; but it cannot, even by validating or curative statutes (and we have none here), validate a bond issue that was absolutely void because of the failure to submit the question to a vote of the interested electorate, as required by the Constitution.

"Finally, respondent invokes the provisions of section 9, chapter 142, Laws of 1915, as curative of all the defects pointed out in the complaint. For present purposes it may be assumed that these provisions are ample to cure all mere irregularities, and that they cover with their protecting mantle all such failures as are here recorded when they occur after proceedings sufficient to confer jurisdiction; yet, certain it is that the Legislature cannot breathe the breath of life into a dead thing." Cooper et al. v. City of Bozeman, 54 Mont. 277, 169 P. 801, 803.

"It is further contended that the validating act of 1925 (Laws of 1925, p. 565), had the effect to make valid the school tax in question. The power of the Legislature to validate by curative law any proceedings which it might have authorized in

advance is limited to the case of the irregular exercise of power. It cannot cure the want of power to act." People ex rel. Kjellquist v. Chicago, etc., R. Co., 321 Ill. 499, 152 N.E. 560, 562.

Also see: Simpson v. Teftler, 176 Ark. 1093, 5 S.W.2d 350; Hall v. Mitchell, 175 Ark. 641, 1 S.W.2d 59; McGillic v. Corby et al., 37 Mont. 249, 95 P. 1063, 17 L.R.A., N.S., 1263; Anderson et al. v. Lehmkuhl, 119 Neb. 451, 229 N.W. 773; Roberts et al. v. Eyman et al., 304 Ill. 413, 136 N.E. 736; Booth v. Hairston, 195 N.C. 8, 141 S.E. 480.

The majority, by the specious reasoning that because the legislature might have provided a different method or board for the calling and holding of an election, conclude the bonds were legalized by these statutes of limitation. In other words, they are held to be a valid substitute for an election which the Constitution requires to be held before bonds can be issued. The legislature could not, and did not by these statutes, validate bonds that were to be issued in the future in violation of a constitutional inhibition. By them certain persons and corporations were deprived of a remedy theretofore existing to contest the validity of the proposed bond issue, but that did not legalize that which was void.

As I read Weinberger v. Board of Public Instruction, supra, the Florida case cited by the majority, it supports my conclusion and not the majority opinion. In that case the Board of Public Instruction undertook to issue bonds with maturities

fixed contrary to an express and continuing limitation of the Constitution. Thereafter a statutory action was brought in the Circuit Court to test the validity of the bonds and a decree entered validating them. The Weinberger case was thereafter brought by a taxpayer to enjoin the issuance of the bonds. From a decree denying an injunction an appeal was taken. The Florida court held that the bonds were void ab initio and that the validating decree of the Circuit Court did not affect the right of a taxpayer not a party thereto, to contest their validity in a court of equity. The court said:

"The principle is well established that, where the Constitution expressly provides the manner of doing a thing, it impliedly forbids its being done in a substantially different manner. * * * Therefore, when the Constitution prescribes the manner of doing an act, the manner prescribed is exclusive, and it is beyond the power of the Legislature to enact a statute that would defeat the purpose of the constitutional provision. * * *

"The Legislature, by a curative statute, may even validate bonds originally issued without authority, provided the Legislature could have authorized the issuance of the bonds in the first place. See State ex rel Nuveen v. Greer, supra. But when bonds are issued in violation of a mandatory provision of the Constitution, as, for instance, when in excess of the debt limit fixed by the Constitution * * *, or when such bonds have not been authorized by a two-thirds vote of the people, as required by the Constitution * * *, or, as in the case before us, where the maturities fixed by the issuing body are contrary to the express requirement of the Constitution, such bonds are void ab initio, and cannot be validated by curative legislation. * * *

"Although the constitutional provision now under consideration may be designed in part to protect the individual property rights of the taxpayer, it is primarily an express and continuing limitation upon the power to issue the bonds. Such a constitutional provision is a continuing command. It may be satisfied only by strict compliance. It is not subject to or susceptible of legislative regulation or restriction upon the time within which a failure to observe the same may be asserted. Bonds issued in violation thereof are void ab initio." [93 Fla. 470, 112 So. 256.]

The majority opinion does not validate the bonds. They are still invalid, and the question of their validity may be raised in the future because issued in violation of Sec. 11 of Art. 9 of the State Constitution; and no validating or curative statute, and surely no limitation statute, can remedy the constitutional defect that voids them.

"A validating decree authorized only by legislative enactment is therefore ineffectual to bar an affected taxpayer, otherwise entitled so to do, and who did not intervene and raise such objection in the statutory validation proceeding, from subsequently resisting the issuance of the bonds

on the ground that one of the essential and indispensable steps in the proceedings by which the bonds are to be issued was had in violation of a mandatory provision of the Constitution, a noncompliance with which the complaining taxpayer cannot waive." Weinberger v. Board, supra.

The effect of the Lanigan decision is that the interested electors must approve the bond issue at an election provided for by law; an election called by the proper board or body after notice given by it. This case is an outstanding decision that has been consistently followed by this court until this time.

We have held in a long line of cases that the curative provisions of our tax statutes with respect to tax sales, cured no jurisdictional defects that could not be dispensed with by the legislature (Williams v. Van Pelt, 35 N.M. 286, 295 P. 418), and surely these limitation statutes are not, and cannot be, more effective regarding the illegal issuance of municipal bonds. Even assuming that validating or curative legislation would have remedied the defect of the failure to submit the question of the issuance of the bonds at an election provided for by law to vitalize Section 12 of Article 9 of the State Constitution, we have no such statute.

These limitation statutes purport to bar suits against the district to contest the validity of the bonds, but have no reference to actions by it, or its right to defend against a suit on void bonds that could not be brought until the bonds mature.

Regarding the right of a town to defend against a void contract, this court said in Hagerman v. Town of Hagerman, 19 N. M. 118, 141 P. 613, 617, L.R.A.1915A, 904: "Here we have an express mode provided by statute for the entering of into contracts of the nature we hold this to be, i. e., an approval by the vote of the people of the town, and a further statutory limitation upon the amount of indebtedness to be contracted. Without such vote and approval, the contract or ordinance is a nullity. The rule is well settled that, where one enters with a municipal corporation into a contract, which is void because opposed to the Constitution and laws of the state, and contrary to its settled public policy, complete performance of such contract on the part of such person will not prevent the municipal corporation from pleading its want of powers or the illegality of the contract."

See 1 Jones on Bonds and Securities, Sec. 307.

It would be far better to require municipalities to follow the statute in issuing bonds, though the people are put to the trouble of holding a legal election, rather than permit them to place void securities upon the market, with a limitation statute of doubtful value as a protection to the purchaser.

The Attorney General's opinion on the legality of the bonds is correct, and the decree should be reversed and the cause dismissed.