806 P.2d 1085

STATE of New Mexico ex rel. Hal STRATTON, Attorney General of New Mexico, Plaintiff–Appellant,

v.

ROSWELL INDEPENDENT SCHOOLS, Albuquerque Public Schools, Barbara A. Perea Casey and Gary Hocevar, Defendants–Appellees.

Barbara A. Perea CASEY, Plaintiff–Appellee,

v.

Honorable Hal STRATTON, Attorney General of the State of New Mexico, et al., Defendants–Appellants,

and

The Roswell Independent School District, Defendant–Appellee.

Nos. 10957, 10958.

Court of Appeals of New Mexico.

Jan. 31, 1991.

Hal Stratton, Atty. Gen., Randall W. Childress, Deputy Atty. Gen., Henry M. Bohnhoff, Deputy Atty. Gen., Santa Fe, for plaintiff-appellant and defendants-appellants.

Arthur D. Melendres, Suzanne R. Spiers, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for defendant-appellee Albuquerque Public Schools.

Charlotte H. Hetherington, Simons, Cuddy & Friedman, Santa Fe, for defendant-appellee Roswell Independent Schools.

Jerry Wertheim, Steven L. Tucker, Jones, Snead, Wertheim, Rodriguez & Wentworth, P.A., Santa Fe, for defendant-appellee and plaintiff-appellee Barbara A. Perea Casey.

Joseph Goldberg, David J. Stout, Carpenter and Goldberg, P.A., Albuquerque, for defendant-appellee Gary Hocevar.

## OPINION

APODACA, Judge.

Attorney General Hal Stratton (Stratton) appeals from separate summary judgment orders of the respective district courts of Santa Fe and Bernalillo Counties (referred to respectively as the Santa Fe County lawsuit and the Bernalillo County lawsuit) in two separate cases that have been consolidated for appeal. Both district courts

independently granted the respective summary judgment motions of appellees. Stratton raises three issues on appeal: (1) whether public school teachers and administrators are "employees of the state" under NMSA 1978, Sections 2-1-3 and -4 (Repl.Pamp.1983); (2) whether two separate articles of the New Mexico Constitution bar such teachers and administrators from serving in the state legislature; and (3) whether the complaint filed against Stratton in the Santa Fe County lawsuit by appellee Barbara A. Perea Casey (Casey) presented a justiciable "case and controversy."

These consolidated appeals involve a school teacher and a school administrator who are also members of the state legislature. Casey is a teacher with appellee Roswell Independent Schools (Roswell school district) and appellee Gary Hocevar (Hocevar) is an administrator with appellee Albuquerque Public Schools (Albuquerque school district). Stratton contends that both Casey and Hocevar are prohibited, as members of the legislature, from receiving compensation for services performed as state employees under Section 2-1-3. He also maintains that, under Section 2-1-4, both the Roswell and Albuquerque school districts are prohibited from paying compensation to Casey and Hocevar, respectively, while they serve as legislators, for services performed as employees of the state. Stratton's constitutional issue is two-fold. First, he claims that Casey's and Hocevar's dual roles as teacher-legislator violate the separation of powers doctrine of the New Mexico Constitution, article III, section 1 (Cum.Supp.1990). Second, he argues that their respective employment contracts violate the constitutional provision of article IV, section 28, which prohibits legislators from receiving any direct or indirect benefit from any contract "with the state" authorized by any law passed during their terms.

We hold that (1) public school teachers and administrators are not state employees within the meaning of Sections 2-1-3 and -4; (2) Casey's and Hocevar's employment by the respective school districts does not violate article III, section 1, because school teachers and local public school administrators are not persons charged with the exercise of the sovereign powers properly belonging to the executive branch of government; (3) the prohibitive language of article IV, section 28 does not apply to Casey and Hocevar, because their respective contracts were not "with the state" and were not *authorized* by any law passed during their respective terms; and (4) Casey's complaint, filed as a declaratory judgment action against Stratton, presented a justiciable "case and controversy." We therefore affirm the district courts' separate orders granting summary judgment to appellees.

None of the parties contend that there are any genuine issues of material fact. Disposition of these appeals, therefore, focuses only on whether appellees were entitled to summary judgment as a matter of law, without consideration of any disputed facts.

BACKGROUND

In March 1988, Stratton issued an opinion stating that public school teachers or administrators could not legally serve in the legislature while receiving compensation from local school districts. AG Op. No. 88-20 (1988). A few weeks later, Casey filed an action for declaratory judgment against Stratton in the Santa Fe County district court, seeking a ruling that Section 2-1-3 did not prohibit her dual roles. She later amended her complaint to include the Roswell school district, her employer, as a defendant. While the Santa Fe County lawsuit was pending, and on the same day that he filed a motion to dismiss the Santa Fe County lawsuit on the grounds that there was no actual controversy, Stratton filed a complaint in the Bernalillo County district court, asserting the same or similar issues that Casey had raised in her complaint and seeking declaratory and injunctive relief. Stratton's complaint named Casey, Hocevar, the Roswell school district and the Albuquerque school district as defendants. In his first cause of action for declaratory relief against the Roswell and Albuquerque school districts, Stratton contended that school districts

were arms of the state. As such, he alleged, any employees of local school districts were necessarily state employees. Stratton thus asserted that Sections 2–1–3 and –4 prohibited school districts from employing legislators.

In his cause of action for declaratory relief against Casey and Hocevar, Stratton alleged that article III, section 1 of the New Mexico Constitution prohibited school districts from employing legislators in any capacity while they served in the state legislature. Such employment, he contended, violated the constitutional doctrine of separation of powers. In his cause of action for injunctive relief against the local school districts, Stratton alleged that the school districts were employing and compensating members of the state legislature in violation of state constitutional and statutory law. He requested injunctive relief enjoining the school districts from continuing to employ and pay compensation to members of the legislature. Casey and Hocevar receive a salary and other benefits under their respective employment contracts. Their salaries are paid from funds appropriated by the state legislature.

DISCUSSION

1. *The Meaning of "Employee of the State" Under Sections 2–1–3 and –4.*

Section 2–1–3 provides that "[i]t is unlawful for any member of the legislature to receive any compensation for services performed as an officer or employee of the state, except such compensation and expense money as he is entitled to receive as a member of the legislature." Section 2–1–4 states that "[i]t is unlawful for any officer of the state of New Mexico to pay to any member of the legislature compensation for services rendered the state of New Mexico as an officer or employee * * *." All parties have focused their respective arguments heavily on what they perceive to be the legislative history of the statutes, as well as the pertinent case law, and on the amount of control the state exerts over the operation of the local school districts by law and the amount of funding the districts receive from the state.

"[T]he intention of the legislature, in passing a statute, is the primary and controlling consideration in determining its proper construction." *Reese v. Dempsey,* 48 N.M. 417, 424, 152 P.2d 157, 161 (1944). "A statute should be interpreted to mean what the Legislature intended it to mean, and to accomplish the ends sought to be accomplished by it." *State ex rel. Newsome v. Alarid,* 90 N.M. 790, 794, 568 P.2d 1236, 1240 (1977). The supreme court emphasized the importance of looking to the intent of the legislature in *State v. Nance,* 77 N.M. 39, 46, 419 P.2d 242, 246–47 (1966) (citations omitted):

[I]n construing a statute, the legislative intent must be given effect by adopting a construction which will not render the statute's application absurd or unreasonable. Not only must the legislative intent be given effect, but the court will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature * * *.

[W]here the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others.

*See also State ex rel. Klineline v. Blackhurst,* 106 N.M. 732, 749 P.2d 1111 (1988) (court may consider the history and background of the statute, in addition to the language, in order to determine the legislature's intent).

■ We determine that Sections 2–1–3 and –4 are penal statutes, and we will strictly construe them to avoid broadening the definition of the actions deemed criminal by them. *See State v. Allen,* 77 N.M. 433, 423 P.2d 867 (1967). "If there is any doubt about the meaning of a penal statute or rule, it will be construed against the state or agency which enacted it and in favor of the accused." *Bokum Resources Corp. v. New Mexico Water Quality Control Comm'n,* 93 N.M. 546, 552, 603 P.2d 285, 291 (1979).

■ A strict statutory construction standard ordinarily requires us to determine the legislative intent primarily from the language used in the statute as a whole. *State v. Sinyard*, 100 N.M. 694, 675 P.2d 426 (Ct.App.1983). When the words of the statute are free from ambiguity and doubt, resort should not be undertaken to any other means of interpretation. *Id.* Under a plain language analysis of Sections 2–1–3 and –4, these provisions apply only to *employees* of the *state*. The difficulty, however, lies in the confusion of what the legislature meant by using the phrase "employee of the state." Since we determine that the phrase used is ambiguous, we must apply statutory construction principles to determine the legislative intent.

Appellees acknowledge that school instructors and administrators are state employees for certain purposes. Our supreme court, for example, has held that school districts are governmental auxiliaries of the state and termed them "involuntary political subdivisions," and thus not subject to an action under the former Workmen's Compensation Act without the state's express consent. *McWhorter v. Board of Education*, 63 N.M. 421, 423, 320 P.2d 1025, 1026–27 (1958).

" 'A school district is a governmental auxiliary of the state, and the state incorporates it that it may more effectually discharge its appointed duties; they are termed involuntary political subdivisions of the state or territory, created by the general laws to aid in the administration of government in carrying out the universal public-school system. * * *' 1 Dillon, Secs. 19, 20, 21, 22 and 23."

Under such a definition, a school district is a part of the state government incorporated for convenience only and not intended for a separate existence. *Id.* (quoting *Water Supply Co. of Albuquerque v. City of Albuquerque*, 9 N.M. 441, 450, 54 P. 969, 972 (1898)).

The Tenth Circuit has also held that local school districts are "arms of the state" for eleventh amendment state sovereign immunity purposes. *See Garcia v. Board of Educ. of Socorro Consol. Sch. Dist.*, 777 F.2d 1403 (10th Cir.1985); *Martinez v. Board of Educ. of Taos Municipal Sch. Dist.*, 748 F.2d 1393 (10th Cir.1984). Stratton relies on these two federal cases to support his argument that local school districts are "arms of the state," and that consequently, employees of local school districts are in fact state employees.

Our supreme court, however, in *Brown v. Bowling*, 56 N.M. 96, 240 P.2d 846 (1952), held otherwise, in the context of another, unrelated statutory provision. In *Bowling*, a statute provided that no person employed in *any* capacity by the state, county or municipality could purchase lands from the State Tax Commission. It provided further that any violation would result in removal from office. The statute was invoked when a rural school teacher purchased some land from the commission. The issue was whether she was a state, county or municipal employee. Since the statute was penal in character, as in these appeals, the supreme court strictly construed it. *See id.* at 100, 240 P.2d at 849.

Although the language of the subject statute in *Bowling* was arguably broader than the statutes at issue here, the supreme court held that the teacher in *Bowling* was not a state, county or municipal employee *for purposes of the statute*. The court said:

This statute plainly states the class of persons affected by its provisions and it is *obvious* that its *purpose* is to prevent those persons employed by state, county or municipality from dealing in tax titles or in tax sale certificates because out of such employment by state, county or municipality, some advantage might be gained and used to the detriment of the taxpayer and the public * * *.

Surely it cannot be successfully argued that a rural school teacher because of her employment by a County Board of Education should by construction be said to be a person of a class who might profit unduly or unfairly from the purchase of tax deeds * * * because of such employment. To so hold would be to enlarge the terms of the statute both as to words and meaning.

It is recognized that *for some purposes* the County Board of Education is an agency of the state. *For other purposes*, it is considered separate and distinct from the state or from the county itself. It is an entity for specific governmental purposes distinct from the county within which it lies. [Emphasis added.] *Id.* (citations omitted).

The emphasized language of the *Bowling* holding, we believe, holds the key to our analysis in these appeals. Any control that the state may elect to exercise, under the many constitutional and statutory provisions over the school districts throughout the state, does not play a major role in our disposition. Instead, the language of Sections 2–1–3 and –4, we conclude, although arguably unambiguous, must be interpreted through the vehicle of legislative intent, which may or may not significantly or necessarily involve the question of control.

A careful reading of *McWhorter* reveals that our supreme court did not hold that public school instructors and administrators were state employees for all purposes, but rather, that the purpose of the prohibition or statute affecting their interests must be taken into consideration. In *McWhorter*, the school district argued that it was a political subdivision and agency of the state and that it was thus not subject to a worker's compensation action to which it had not consented or waived its immunity. The plaintiff, on the other hand, argued that the school district was a municipal corporation and therefore not entitled to the state immunity provisions. He relied on NMSA 1953, Section 11–6–20, which stated that " '[t]he term municipal corporation shall, *for the purposes of this act*, be construed to mean county, * * * or school district.' " *Id.* at 423, 320 P.2d at 1027 (emphasis added).

*McWhorter* noted that the statute itself limited the definition of a municipal corporation for the purpose of the issuance and sale of bonds of political subdivisions, and had nothing to do with the worker's compensation issue before it. As it noted that a school district was a municipal corporation for some purposes, but not for others,

the court also determined that a school district was a political subdivision of the state *"in this case"* and " 'subject to the same privileges and immunities *in regard to suit* as the state.' " *Id.* at 425, 320 P.2d at 1028 (emphasis added) (quoting *Ridge v. Boulder Creek Union Junior–Senior H.S. Dist.*, 60 Cal.App.2d 453, 140 P.2d 990, 995 (1943)). We thus read *McWhorter*, not as Stratton would have us do, but, rather, as emphasizing that it is necessary to determine what the "evil" was that the legislature in 1943 intended to protect against by using the phrase "employee of the state."

The federal cases relied on by Stratton fail to address the issue of whether local school districts are "arms of the state" for the express purpose of their employees' eligibility to serve as legislators. It is quite a different question from that of whether local school districts are protected under the general shield of sovereign immunity. As noted previously, all of the parties, especially Stratton, have focused considerable attention on the amount of control the state exerts over the overall operation of the various school districts in the state. We conclude that, although the "control test" is a viable concern in interpreting the intent of the legislature for the purposes of sovereign immunity and local school district liability in general, it is not the pivotal point of concern in determining whether school district employees may serve as members of the legislature. Nonetheless, we shall address the parties' arguments relative to the issue of state control over public education in the state.

Stratton argues that the pervasive constitutional, statutory and regulatory scheme relative to the administration, management, and financing of local school districts is controlling in determining that local school districts are "arms of the state" and, consequently, that their employees are in reality state employees. *See, e.g.,* N.M. Const. art. XII, § 3 ("[t]he schools * * * provided for by this constitution shall forever remain under the exclusive control of the state,"); NMSA 1978, §§ 22–1–1 to 22–26–8 and 22A–1–1 to –5 (Repl.Pamp.1989 and Supp.1990), the Public

School Code (creating the State Board of Education, regulating virtually every aspect of public school operations and stating the determination of school policy, and "control, management and direction of all public schools," including financial direction, distribution of school funds and financial accounting for all schools); *Prince v. Board of Educ.*, 88 N.M. 548, 543 P.2d 1176 (1975) (interpreting "control" in article XII, section 3, as control over the curriculum, discipline, finances and administration of the schools, and in general, control over all the affairs of the school). To be sure, there is no doubt, in our own minds, that the state maintains a great degree of control over local school districts.

Appellees, on the other hand, emphasize that there are other similar statutes and regulations controlling other political subdivisions, businesses, and professions, and that the mere existence of various statutes and regulations, no matter their number, does not of itself transform a political subdivision, business, or profession into state government. If regulatory schemes did indeed transform local governmental bodies or the private sector into "state government," this rationale could convert certain highly regulated businesses, such as liquor establishments, into state agencies. Such a result would be absurd and is prohibited by New Mexico's rules of statutory construction. *Gutierrez v. City of Albuquerque*, 96 N.M. 398, 631 P.2d 304 (1981).

■ We turn now to a review of the legislative history and pertinent case law available to assist us in determining the evil sought to be prevented by our legislature in its enactment of Sections 2–1–3 and –4. *See Klineline v. Blackhurst.* "When interpreting a statute we presume that the Legislature was informed as to existing law, and that the Legislature did not intend to enact a law inconsistent with any existing law." *Quintana v. New Mexico Dep't of Corrections*, 100 N.M. 224, 227, 668 P.2d 1101, 1104 (1983). The legislature is also presumed to have enacted statutes with knowledge of judicial pronouncements. *State v. Tomlinson*, 98 N.M. 337, 648 P.2d 795 (Ct.App.1982). It follows that the leg-

islators in the 1943 legislative session are presumed to have known both the constitutional and statutory distinctions between the state and its political subdivisions and the judicial decisions relating to those distinctions at the time of the enactment of Sections 2–1–3 and –4.

First, the New Mexico Constitution does not include "political subdivisions" within the term "state." School districts are designated "as the political subdivision[s] of the state for the administration of public schools and segregated geographically for taxation and bonding purposes." NMSA 1978, § 22–1–2(J) (Repl.Pamp.1989). Political subdivisions are not synonymous with "state." In NMSA 1978, Sections 10–6–1 to –4 (Repl.Pamp.1990), relating to vacancies in public office, the legislature addressed vacancies at the *state*, county, municipal, and *school district* level. The legislature identified the different levels of government when referring to "state" and other subordinate political subdivisions.

■ Sections 2–1–3 and –4 do not include employees of the other enumerated political subdivisions, such as counties and municipalities. Using a restrictive statutory construction standard, local school districts also should not be included. When the constitution either grants or prohibits certain powers, the affected subdivisions are specifically enumerated. *See* N.M. Const. art. IV, § 32; art. VIII, § 3; art. IX, § 9; art. IX, § 14; and art. IX, § 15. Several other statutes also differentiate between state and political subdivisions, including local school boards. *See, e.g.*, NMSA 1978, §§ 6–16–1 to –5 (Repl.Pamp.1988) (Public Securities Validation Act); § 10–1–7 (Repl. Pamp.1990) (provisions of employment contracts); §§ 10–3–1 and 10–4–1 (Repl.Pamp. 1990) (abandonment of public office or employment); §§ 10–9–1 to –25 (Repl.Pamp. 1990) (State Personnel Act); and §§ 10–11–1 to –140 (Repl.Pamp.1990) (Public Employees Retirement Act).

■ Second, for over forty years, the legislature has known of the attorney general's opinion rendered after the passage of Sections 2–1–3 and –4, holding that these laws did not prohibit a local school district

from paying or employing a member of the legislature. AG Op. No. 4645 (1945). That opinion was followed and confirmed by Attorney General Fred M. Standley. AG Op. No. 57–11 (1957–58). "Persuasive weight is given to long-standing interpretations of a doubtful or uncertain statute by the administrative agency charged with administering the statute." *Molycorp, Inc. v. State Corp. Comm'n*, 95 N.M. 613, 614, 624 P.2d 1010, 1011 (1981). The more longstanding the agency's interpretation of the statute without amendment by the legislature, the more likely that the agency's interpretation reflects the legislature's intent. *In re Application of Sleeper*, 107 N.M. 494, 760 P.2d 787 (Ct.App.1988).

Finally, the legislature is also presumed to have known New Mexico case law. In *Bowling*, as noted previously, our supreme court held that a teacher employed by a county school board was not a state or county employee for purposes of purchasing property at a county tax sale. Significantly, in 1977 N.M. Laws, chapter 336, the legislature amended Sections 2–1–3 and –4 without any change to the phrase "employee of the state." If the legislature had intended to include local school districts in its use of the term "state," it could have easily done so then.

Additionally, a review of the legislative proceedings, at which the legislation at issue was discussed, suggests to us that the legislation's supporters were primarily concerned with a conflict of interest much more significant than those existing when a school teacher or administrator becomes a member of the legislature.

▮ Our review of what record there is of these legislative proceedings reflects that the legislature's overriding concern was legislative independence from potential control by the executive branch of government, mainly the governor, to avoid the "Huey Long" scenario in Louisiana.[1] Public school employees in 1943 were not subject to this type of control by the governor or by state agencies directly under the governor's control. Nor are they today. Although the possible abuse of teachers directly profiting from their term as legislators may be a strong basis for a determination of a prohibitive conflict of interest, we conclude this determination runs counter to the constituency concept of our legislature in this state, which can accurately be described as a citizens' legislature. In a sparsely populated state like New Mexico, it would prove difficult, if not impossible, to have a conflict-free legislature. This view formed the basis for the holding in *Reilly v. Ozzard*, 33 N.J. 529, 166 A.2d 360 (1960), in which the issue was whether a person could concurrently hold the offices of state senator and township attorney.

[T]he possibility of a conflict of interest[ ] is not peculiar to the case of duality of officeholding by a legislator. Rather it is part of a larger problem which inheres in the nature of the legislative authority and confronts all members of

---

1. As noted in Hocevar's Answer Brief, "[c]ontemporaneous legislative statements recorded during the enactment of Laws of 1943, Chapter 18, Senate Bill No. 4, now [Section] 2–1–3, show that the legislature's overriding concern was legislative independence and the adverse effect of an executive officer's potential control over legislators:

> But it is really a very important bill, to maintain the Legislature as an independent branch of the Government, as the Constitution of the State intends it to be. Your Legislature will never amount to anything as long as it is composed of members on the payroll. We have been very fortunate, we haven't had any Huey Longs, to speak of, in New Mexico, or otherwise, probably, we would be telling another story. All of us know that the secret of Huey Long's power in his state was the fact that he could call the Legislature directly to

do something, and adjourn it when he pleased, because, he had the members on the payroll. I believe the people of New Mexico are entitled to have Representatives in their Legislature who are constitutionally in abeyance with the objections and suggestions of the Executive Branch of the state and the conditions existing here, this is a way to get by, at least to do something for the future.

> \* \* \* \* \* \*

> I don't think we could do anything better in this Legislature than to take a step forward in making the Legislature an independent body, standing on its own two feet, instead of a bunch of rubber stamps subservient to the will of the Governor when he chooses to make it such \* \* \*.

*Journal of New Mexico Senate and House of Representatives for the Sixteenth (16th) Legislature."*

that department of government. This is so because the police power and the taxing power range so widely that every legislator, whether he be in a private calling or in another public post or in neither, must inevitably have some interest which may conceivably be affected by some legislative proposal at some time. *Id.* at 549–50, 166 A.2d at 370. We subscribe to this analysis and conclude that, in enacting Sections 2–1–3 and –4, the legislature did not intend to prohibit school teachers or administrators from being state legislators while employed by a school district.

**2. *Separation of Powers—Article III, Section 1.***

■ Article III, Section 1 of the New Mexico Constitution (Cum.Supp.1990) provides, in part:

The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of *persons charged with the exercise of powers* properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted. [Emphasis added.]

Stratton argues that this constitutional provision is violated if public school employees serve as legislators contemporaneously with their school employment. This issue is resolved by a determination of whether public school personnel can be reasonably grouped as members of that class of persons who are "charged with the exercise of powers," as that phrase is used in article III, section 1. For the reasons that follow, we have determined that they do not exercise such powers. We thus conclude that the constitutional provision is not violated.

■ Article III, section 1 ensures that "one branch of state government" will not "exercise powers and duties belonging to another." *State ex rel. State Corp. Comm'n v. McCulloh,* 63 N.M. 436, 438, 321 P.2d 207, 208 (1957). In *State ex rel. Barney v. Hawkins,* 79 Mont. 506, 257 P.

411 (1927), the Montana Supreme Court developed a separation of powers analysis that distinguished between a public officer who is invested with sovereign powers and an ordinary employee who is not. *Hawkins* held that only state officers vested with the powers of government exercise authority within the contemplation of a separation of powers provision identical to that of New Mexico. The Montana court developed a five-part test for determining whether an employee is a public officer, which test New Mexico has adopted. *See State v. Quinn,* 35 N.M. 62, 290 P. 786 (1930). One New Mexico decision stressed one of these factors as most important—to be a public officer, the person must be invested with sovereign power. *State ex rel. Gibson v. Fernandez,* 40 N.M. 288, 292, 58 P.2d 1197, 1200 (1936). The requirement of sovereign power being invested in the individual alleged to be violating separation of powers principles exists because the evil to be prevented is that of one *branch* treading outside its constitutional boundary into the area of another.

Public school instructors and administrators are not "public officials." They do not establish policy for the local school districts or for the state department of education. Stratton conceded that public school instructors and administrators do not hold "office" as that term is used in the constitution. Yet, he has not attempted to explain how teachers exercise "sovereign power." Instead, he attempts to bootstrap the separation of powers argument to the argument that teachers, as employees of the school districts, are part of the executive power, contending that this conclusion necessarily follows from the premise that school districts are but arms of the state.

Stratton relies on *Monaghan v. School District No. 1, Clackamas County,* 211 Or. 360, 315 P.2d 797 (1957) (en banc), in support of his argument that a public school teacher violates the separation of powers provision by serving in the legislature. *Monaghan,* however, was decided under substantially different constitutional language. That case construed a constitutional provision that read in part, " 'no person charged with official duties under one

of these departments, shall exercise any of the *functions* of another * * *.' " *Id.* at 364, 315 P.2d at 800 (emphasis added). A reading of *Monaghan* indicates that the Oregon provision was adopted from the constitution of Indiana.

The Indiana Constitution, when first proposed, had contained the word "power," as does our constitution. That term, however, was later changed to "functions." *Id.* at 368, 315 P.2d at 804. Both the Indiana and Oregon courts noted that the term "functions" referred to a broader category of activities than the word "power." *Monaghan* held that the term "function" included "employment." *Id.* *Monaghan* therefore concluded that teaching was a "function" of the executive branch of government. Consequently, a legislator could not also be a teacher under Oregon's constitution. The Oregon court in *Monaghan* emphasized that Oregon's separation of powers provision was like no other in the United States, except that of Indiana. We consider the Oregon constitutional provision significantly different to distinguish *Monaghan* from these appeals. We thus conclude that New Mexico's article III, section 1 applies only to "officers" exercising sovereign power.

New Mexico has differentiated an "employee" from a "public officer" based on the exercise of "sovereign power." *See State v. Quinn* (using the *Hawkins* test to differentiate public employees from public officers); *see also State ex rel. Gibson v. Fernandez,* 40 N.M. at 292, 58 P.2d at 1200 (requiring that some portion of sovereignty, i.e., "power, jurisdiction and authority," must be vested in the occupant of a position to constitute "public office"); *Lacy v. Silva,* 84 N.M. 43, 499 P.2d 361 (Ct.App. 1972) (position is one of employment and not a public office if sovereign power is not vested in the position by the legislature); 63A Am.Jur.2d *Public Officers and Employees* § 12, at 676 (1984) ("the characteristics of public office include creation of the office by statute or constitution, exercise of some portion of the sovereign power, a continuing position not occasional or contractual, a fixed term of office, an oath, liability for misfeasance or nonfeasance,

and independence beyond that of employees[;] a public employment, on the other hand, is a position in the public service which lacks sufficient of the foregoing elements or characteristics to make it an office." (footnotes omitted)).

■ Based on our review of these cases, we conclude that article III, section 1 applies to public officers, not employees, in the different branches of government. School teachers are not "public officers." "A school teacher employed by a common school district is [an] 'employee' not [an] 'officer', and the relationship between school teacher and school board is contractual only." *Brown v. Bowling,* 56 N.M. at 101, 240 P.2d at 849; *cf. Amador v. New Mexico State Bd. of Educ.,* 80 N.M. 336, 455 P.2d 840 (1969) (the position of school teacher is not an office within meaning of statute providing that office becomes vacant when officer accepts or undertakes discharge of duties of another incompatible office). We therefore conclude that, since Casey and Hocevar were not officers but only employees, they were not barred by our separation of powers provision from being legislators.

### 3. *Are the Employment Contracts in Violation of Article IV, Section 28?*

Article IV, section 28 states in part: "No member of the legislature shall, ... during the term for which he was elected nor within one year thereafter, be interested directly or indirectly in any contract with the state or any municipality thereof, which was authorized by any law passed during such term." In 1987 and 1988, Casey and Hocevar attended the regular sessions of the legislature. During the course of these legislative sessions, bills were passed appropriating monies for public school employee salaries. Casey also served during sessions in which legislators specifically appropriated money to increase salaries of public school teachers. Stratton argues that these appropriation bills, under which public school teachers benefited, "authorized" a contract of employment prohibited by article IV, section 28.

 We will only briefly discuss this issue for two reasons. First, based on the rationale contained in our previous discussion of the statutory provisions at issue in these appeals, we determine that the employment contracts were not made "with the state" as required by article IV, section 28. Second, we conclude that our supreme court's decision in *State ex rel. Baca v. Otero*, 33 N.M. 310, 267 P. 68 (1928), controls our disposition. In that case, Stratton's argument was essentially rejected. *Otero* held that an appropriations bill does not "authorize" a contract of employment with the state within the meaning of this provision. We thus conclude that the general appropriations bill increasing the salaries of public school employees did not authorize Casey's and Hocevar's employment contract.

 The only remaining question under article IV, section 28 is the employment contract of Casey with the Roswell school district. Casey served in the legislature when NMSA 1978, Section 22–10–11(B)(5) (Repl.Pamp.1989) was amended in 1986. That statute authorized local school districts, in their discretion, to enter into contracts with teachers for a term not exceeding three years. Previously, school districts only had authority to enter into one-year contracts. However, Casey has never benefited *directly* from the 1986 amendment. She has never had a contract exceeding one year. Nor is there any indication in the record that Casey has ever indirectly benefited from the three-year option. The Roswell school district, not Casey, sets the term of her contract. Additionally, we conclude that Casey's contract is with the Roswell school district, not with the "state" or a "municipality" as the terms are used in article IV, section 28. Finally, Roswell Schools has had the "authority" to enter into an employment contract with Casey for the past fifteen years or so that Casey has been employed as a teacher. If anything, Section 22–10–11 only defines the term of her employment, it does not "authorize" her employment contract. *See* § 22–5–4 (Supp.1990).

#### 4. Casey's Complaint—Did It Present An "Actual Controversy"?

Stratton contends we should reverse the Santa Fe County district court's refusal to dismiss Casey's complaint. He bases this contention on an alleged lack of subject matter jurisdiction, arguing there was not an "actual controversy" between Casey and the state at the time her complaint was filed. *See Taos County Bd. of Educ. v. Sedillo*, 44 N.M. 300, 308, 101 P.2d 1027, 1032–3 (1940); *State ex rel. Overton v. New Mexico State Tax Comm'n*, 81 N.M. 28, 31, 462 P.2d 613, 616 (1969). Stratton argued to the district court, as he essentially argues on appeal, that, at the time Casey filed her complaint, the only relationship between the parties hinged upon Casey's dual status as a teacher-legislator and the fact that Stratton, in performing the duties of attorney general, issued an opinion that public school instructors were "state employees" within the meaning of Sections 2–1–3 and –4. He claims that this scenario could not create an actual "case or controversy" sufficient to give the district court subject matter jurisdiction to entertain Casey's claims for relief.

In an action seeking declaratory relief, the plaintiff must establish:

> "a controversy involving rights or other legal relations of the parties seeking declaratory relief; a claim of right or other legal interest asserted against one who has an interest in contesting the claim; interests of the parties must be real and adverse; and the issue involved must be ripe for judicial determination."

*Chronis v. State ex rel. Rodriguez*, 100 N.M. 342, 347, 670 P.2d 953, 958 (1983) (quoting *Sanchez v. City of Santa Fe*, 82 N.M. 322, 324, 481 P.2d 401, 403 (1971) (citations omitted in original)).

Stratton contends that the issuance of an attorney general's opinion, in and of itself, does not create a justiciable controversy. He relies on several cases from other jurisdictions for this premise. *See Askew v. City of Ocala*, 348 So.2d 308, 310 (Fla. 1977); *see also Kelley v. Board of Registration in Optometry*, 351 Mass. 187, 218 N.E.2d 130 (1966) (that the attorney gener-

al has rendered an opinion does not of itself raise the matter to the dignity of a justiciable controversy); *Gershman Inv. Corp. v. Danforth*, 517 S.W.2d 33 (Mo.1974) (en banc) (no justiciable controversy exists from the giving of an opinion by an attorney general); *City of Jackson v. Heritage Sav. & Loan Ass'n*, 639 S.W.2d 142, 145–46 (Mo.Ct.App.1982) (conflicting opinions of the attorney general merely establish a difference of opinion on a question of law and do not establish a justiciable controversy).

At the time Casey filed her complaint, Stratton claims that he had done nothing more than issue an opinion. He argues that he had not made any claim or threat against Casey on civil or criminal grounds. Additionally, he claims he had not demanded that Casey resign from either her position as a legislator or her teaching job with the Roswell school district. In fact, Stratton conceded in his written opinion that "constitutional principles may preclude the Attorney General from intervening to bar a public school instructor or administrator from sitting in any particular session." AG Op. No. 88–20, at 3 (1988). Also, Stratton continues, no citizen had brought suit or threatened to bring suit to enjoin Casey from receiving compensation as a teacher, as permitted under NMSA 1978, Section 2–1–6 (Repl.Pamp.1983). Stratton argues that the absence of any of these possible actions undertaken by his office, or anyone else, precluded the existence of a justiciable controversy, and consequently, of subject matter jurisdiction in the district court.

At oral argument, Stratton expressed his concern that if the issuance of every attorney general opinion was deemed to create a case or controversy, it would open the courts to many mundane questions caused by one lawyer disagreeing with another, because the disagreement in itself would create a case or controversy. We do not agree.

■ The Declaratory Judgment Act predicates a district court's jurisdiction on "cases of actual controversy." This requirement is met, however, if the question posed to the court is real and not theoretical, the person raising it has a real interest in the question, and there is another person having a real interest in the question who may oppose the declaration sought. *Taos County Bd. of Educ. v. Sedillo.* The remaining predicate to the court's exercise of jurisdiction is that the issue itself must be ripe for judicial determination. *Sanchez v. City of Santa Fe.* We hold that both Casey's original complaint and her first amended complaint established these prerequisites.

■ Although Stratton had not filed his injunctive action before the filing of Casey's original complaint, there nevertheless existed the required actual controversy. Our supreme court has stated:

"It is not necessary that any breach should be first committed, any right invaded, or wrong done. The purpose of the [Declaratory Judgment] [A]ct, * * * is to 'settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered.'"

*Taos County Bd. of Educ.*, 44 N.M. at 309, 101 P.2d at 1033 (quoting *Miller v. Miller*, 149 Tenn. 463, 487, 261 S.W. 965, 972 (1924) (quoting § 12)).

In *Chronis*, the supreme court held that a sufficient controversy existed between the plaintiff liquor license holders and the state, as defendant, with respect to the validity of the pertinent liquor control act, even though the declaratory judgment action brought by the plaintiffs preceded the effective date of the act and there had been no action against the licenses threatened by the state or its officers. *Chronis* reaffirmed that the purpose of the act was to settle and to afford relief from uncertainty. "To compel the licensees to await a summary suspension of their licenses before judicial review would frustrate the purpose of the Declaratory Judgment Act." *Id.* at 347, 670 P.2d at 958. Similarly, Casey should not be compelled to await possible criminal prosecution under NMSA 1978, Section 2–1–5 (Repl.Pamp.1983), or to stop her political campaign for re-election, before judicial review was made available to her.

Since Sections 2–1–3 and –4 are penal statutes potentially resulting in a felony conviction and fines, we believe the effect of Stratton's opinion was to lead Casey to believe that she might be subjected to criminal penalties if she continued in her dual roles. Issuance of the opinion also impaired Casey's campaign for re-election, as well as jeopardized her existing and continued employment with the Roswell school district, with respect to contract renewals for the following school year. We hold that the law does not require more than this, and it should not require Casey to wait for the issuance of an indictment or for the filing of a civil suit before being allowed to file an action for declaratory relief. *Chronis v. State ex rel. Rodriguez.* See, for example, *Acupuncture Society of Kansas v. Kansas State Board of Healing Arts*, 226 Kan. 639, 602 P.2d 1311 (1979), and *Brimmer v. Thomson*, 521 P.2d 574 (Wyo.1974), for cases holding attorney general opinions form the basis of an actual controversy.

We hold that a justiciable controversy existed, in the context of the particular facts of these appeals, where a few, easily identifiable individuals were the subject of Stratton's opinion and were the potential target of any citizen's injunctive action. We limit our holding to the facts of these appeals and observe that not necessarily every attorney general's opinion will create a justiciable case or controversy. Whether it does will depend on the particular facts of each case and subject to the general requirements pronounced in *Taos County Bd. of Educ. v. Sedillo.*

"The trial court is vested with broad discretion to grant or refuse claims for declaratory relief." *Colborne v. Village of Corrales*, 106 N.M. 103, 105, 739 P.2d 972, 974 (1987). Our standard of review for the district court's action upon either acceptance or refusal of a declaratory judgment action is whether the court clearly abused its discretion. *Id.* An abuse of discretion occurs when the district court's ruling is clearly against logic and effect of the facts and circumstances before the court. *Jaramillo v. Fisher Controls Co.*, 102 N.M.

614, 698 P.2d 887 (Ct.App.1985). Reviewed in the light of the issues framed by the parties and the broad statutory language of the Declaratory Judgment Act, we determine that the district court's adjudication of that action was a proper exercise of discretion.

In view of our holding that Casey's original complaint created a justiciable controversy for proper disposition under the Declaratory Judgment Act, we need not address Stratton's argument that Casey's amendment to include the Roswell school district did not cure the jurisdictional problem because the complaint was a nullity from the start. *See DeVargas v. State ex rel. New Mexico Dep't of Corrections*, 97 N.M. 563, 642 P.2d 166 (1982) (there is no relation back where the original complaint is a nullity).

Finally, because of the nature of our disposition, we need not address Casey's argument that the "actual controversy" issue is moot because the rights and duties of the parties would not in any way be affected by a ruling on this issue. *See In re Pernell*, 92 N.M. 490, 493, 590 P.2d 638, 641 (Ct.App.1979) ("Under New Mexico decisions, an appeal will be dismissed if the question presented is moot; mootness includes the question of whether the appellate court can provide 'actual relief'"); *Porter v. Robert Porter & Sons, Inc.*, 68 N.M. 97, 102, 359 P.2d 134, 137 (1961) ("[Supreme court] will not make useless orders nor grant relief that will avail appellant nothing").

## CONCLUSION

Existence of what may be reasonably perceived by some individuals as a conflict of interest should not be, in our view, controlling in the interpretation of the statutory provisions we have been called upon to review. One may legitimately ask—why would the legislature in 1943 intend to include school teachers or administrators as "employees of the state" under the subject statutes? To ask the question another way—why would the legislature intend to apply the prohibition to teachers, and not, let us say, to insurance agents, lawyers, farmers, ranchers and members of other

trades or professions? It should be readily apparent to even the most casual of observers that those professions and trades, too, may create a situation that may be viewed by some as a conflict of interest.

Does not the legislature consider and enact legislation dealing with those subjects? And are not members of those trades and professions represented in our legislative membership, which is made up of our very own citizenry? To simply ask the questions is to answer them. Doing so permits us to conclude that the statutory provisions at issue necessarily must be strictly construed against the arguments made on appeal by Stratton. To be sure, because our legislative membership draws from all walks of life, which is as it should be, conflicts will arise from time to time. But whether such conflicts rise to the level of the impermissible conflicts envisioned by our legislature in 1943 is at the crux of the question we resolve in favor of appellees.

In this connection, we consider it appropriate to quote from Justice Crockett's astute observation in *Jenkins v. Bishop*, 589 P.2d 770, 771 (Utah 1978), supporting the right of educators to serve in the Utah Legislature:

> In our democratic system: the legislature is intended to represent the people that is, to be made up from the general public representing a wide spectrum of the citizenry. It is not to be doubted that legislators from the ranks of education are affected by the interests of that calling. But all other legislators also have interests. No one lives in a vacuum. It is sometimes said that: "In the absence of angels, we must get along with human beings."

In summary, we hold that: (1) public school instructors and administrators are not state employees within the meaning of Sections 2–1–3 and –4, and thus, that they are not precluded from serving as members of the legislature concurrently with their public school employment; (2) article III, section 1 of our constitution does not bar

Casey's or Hocevar's employment under a separation of powers analysis; (3) the general appropriations bills increasing public school employees' salaries, and Section 22–5–4, increasing the potential length of a teacher's employment contract to three years, did not "authorize" such contracts within the meaning of article IV, section 28, and additionally, the employment contracts were not made "with the state" as prohibited by such constitutional provision; and (4) there was a "case and controversy" presented by Casey's complaint. We thus affirm the respective district courts' orders granting summary judgment to appellees. Appellees are awarded their respective costs on appeal.

IT IS SO ORDERED.

ROBERT M. DOUGHTY, II, District Judge, concurs.

HARTZ, J., specially concurs.

HARTZ, Judge (specially concurring).

I concur in the result.

1. The Meaning of "Employee of the State" under Sections 2–1–3 and –4.

a. *State Control of Education.*

The state of New Mexico is intimately involved in education at the school-district level. Much of that involvement derives from the state constitution. Article XII, section 1 requires that a "uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state" be established and maintained. Article XII, section 6(A) (Cum.Supp.1990) provides, "The state board of education shall determine public school policy and vocational educational policy and shall have control, management and direction of all public schools, pursuant to authority and powers provided by law." Article XII, section 3 even says that public schools are "under the exclusive control of the state," although when that section is read in its entirety,[1] its purpose appears to

---

1. "The schools, colleges, universities and other educational institutions provided for by this constitution shall forever remain under the ex-

clusive control of the state, and no part of the proceeds arising from the sale or disposal of any land granted to the state by congress, or any

be (1) to keep the schools public as opposed to private, rather than (2) to eliminate local authority over the schools. *See Prince v. Board of Educ. of Cent. Consol. Indep. School Dist. No. 22*, 88 N.M. 548, 543 P.2d 1176 (1975) (public school on Indian reservation does not violate article XII, section 3). In addition, statutes and regulations implementing article XII, section 6, as well as legislation appropriating funds for the schools, have given our state government extensive authority over local districts.

As a result, the United States Court of Appeals for the Tenth Circuit has held that New Mexico school districts are included within the meaning of "state" in the eleventh amendment to the United States Constitution. *See Martinez v. Board of Educ. of Taos Mun. School Dist.*, 748 F.2d 1393 (10th Cir.1984). Our own supreme court has identified local school districts with the state in holding that a suit under the Workmen's Compensation Act could not be brought against a local school district. *McWhorter v. Board of Educ. of Tatum Indep. School Dist. No. 28*, 63 N.M. 421, 320 P.2d 1025 (1958).

Yet this extensive control by the state over the local schools does not mean that the term "state employee" encompasses "school district employee" whenever the term is used by the state legislature. For example, in *Brown v. Bowling*, 56 N.M. 96, 240 P.2d 846 (1952), our supreme court held that a school teacher was not a "person employed in any capacity by the state" for purposes of a statute barring state employees from bidding at tax sales.

The issue, as the majority states, is one of legislative intent. To determine whether an employee of a local school district is a "state employee" within the meaning of Sections 2–1–3 and –4, one must attempt to discern the legislative intent behind the statutes. That task is best accomplished by examining the purposes of the two companion statutes and the usage of the term "state employee" at the time the statutes

were enacted.[2] The state's control over local school districts is relevant only insofar as (1) effectuation of the statutes' purposes required application of the statutory prohibitions to employees of any public entity subject to such control; and (2) the existence of that control found expression at the time of the statutes' enactment in usage of the term "state employee" to include employees of local school districts.

b. *Purposes.*

Several of the reasons for not wanting state employees in the legislature apply to local district employees. While public employees are serving in the legislature, they cannot attend to the duties of their employment. (I would think that when a teacher misses school for weeks at a time, the educational process can be severely disrupted.) Public employees who serve in the legislature may as legislators undervalue the public interest and promote the special interests of their particular employers in order to advance their personal interests either directly (say, by appropriating money for an increase in salaries) or indirectly (by pleasing their supervisors in their employment). At the same time, a public agency dependent on the good will of the legislature may fail to control and discipline an employee who serves in the legislature, giving the employee free rein to disregard the requirements of the employment. *See Jenkins v. Bishop*, 589 P.2d 770, 773, 776–77 (Utah 1978) (Ellett, C.J., concurring and dissenting) (expressing concerns about school teachers serving in the legislature).

On the other hand, at least one of the evils that Sections 2–1–3 and –4 intended to eliminate is not threatened by permitting employees of local school districts to serve in the legislature. The brief comments of two senators recorded when the state senate passed this legislation focused on concern that the governor could control the legislature by employing legislators in the

---

other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school, college or university."

2. It is unclear to me what the relevance is of the majority's reference to language in statutes enacted many years after Sections 2–1–3 and –4.

executive branch. Such a situation had arisen in Louisiana. *See Saint v. Allen,* 169 La. 1046, 126 So. 548 (1930). There is little risk, however, that permitting local school employees to serve in the legislature will lead to gubernatorial domination of that body. Locally elected school boards have the responsibility for hiring school district employees and no state executive officer is likely to possess the power to compel a local district to hire a particular employee.

Moreover, it is unclear to what extent state government controlled local school finances when Sections 2–1–3 and –4 were enacted in 1943. There may have been little concern at the time about teachers getting raises through legislative action or about local school districts being cowed by an employee who possessed political clout through service in the legislature.

In sum, although certain purposes served by Sections 2–1–3 and –4 could be advanced by including employees of local school districts within the term "state employee," there could also be valid reasons for the legislature to draw the line short of local school district employees. One should not infer too much from statements of two legislators in one chamber concerning the purpose of legislation, but it would not be unreasonable for the legislature to decide to address the principal evil—control of the legislature by the governor (and, perhaps, other executive officials)—and not bother with seemingly lesser evils, particularly when there is the countervailing interest of permitting the electorate to choose whom it wishes to represent it. Thus, despite the sound policy reasons for excluding local school district employees from the legislature, those reasons do not compel the conclusion that the legislature in enacting Sections 2–1–3 and –4 intended to lump those employees with employees hired by and under the direct command of state executive officials.

c. *Usage.*

A second source of guidance is usage. How is the term "state employee" generally understood? Or, more accurately, how was it understood when the legislation was enacted? Several sources can inform us regarding that understanding.

To begin with, I should express my reluctance to rely on two sources used by the majority. One is opinions of the attorney general. Attorney general opinions are only as persuasive as their reasoning and citation to authority. They should not be analogized to the opinions of an administrative agency with special expertise in particular subject matter. Indeed, the judicial decision relied upon by the majority to justify deference to attorney general opinions, *Molycorp, Inc. v. State Corp. Comm'n,* 95 N.M. 613, 624 P.2d 1010 (1981), rejected an attorney general opinion in favor of the practice of the corporation commission. Attorney General Opinion No. 4645 (1945) adds little weight here.

The second questionable source upon which the majority relies is the inaction of the legislature itself. Over the years, despite the enactment of Sections 2–1–3 and –4, the legislature apparently has not expelled employees of local school districts who have been elected to the legislature. Nor has the legislature shown its disapproval of opinions of the attorney general by amending those statutes to include explicitly school district employees. This evidence may be entitled to some weight, but I would largely discount it. It always takes a concerted effort before a group imposes conflict-of-interest limitations on itself. Legislatures are hardly unique in that respect. Once conflict-of-interest legislation is enacted, the political pressure is generally to relent, to not deprive the electorate of its choice. The steam behind the movement for improving ethics dissipates quickly and few if any legislators have the energy to take up the charge. Inertia, rather than informed approval, can explain the legislature's failure to apply Sections 2–1–3 or –4 to employees of local school districts or to amend the statutes. Also, the use of post-enactment legislative history ignores the possibility that attitudes can change from one legislative session to another. Legislation is not voided just because a later legislature disapproves of it; a new statute is required. *See Sullivan v. Fink-*

*elstein,* —— U.S. ——, ——, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563, 577 (1990) (Scalia, J., concurring in part) (objecting to use of post-enactment legislative history).

The source I find more reliable is usage of the term "state employee" in other legislation in effect in 1943. A variety of statutes of that time contained a list of types of employees subject to the provisions of the statute and in the list distinguished state employees from employees of political subdivisions (sometimes explicitly naming school districts). Not all of these statutes are as helpful as others in determining whether school district employees might be considered "state employees." For example, the 1943 session of the legislature enacted what is now NMSA 1978, Section 10–6–1, regarding abandonment of public office. The statute speaks of "any incumbent of any public office or employment of the state of New Mexico, or of any of its departments, agencies, counties, municipalities or political subdivisions whatsoever." It would be a mistake to conclude that because an entity is listed after "state of New Mexico," an employee of the entity is not a "state employee." Surely an employee of an executive *department* was even then considered a state employee. Rather than establishing that employees of political subdivisions are not "state employees," the language of the statute indicates only that the legislature was attempting to be all-inclusive. Except as evidence that the legislature was *not* intending to be all-inclusive in Sections 2–1–3 and –4, that legislation is not much help in answering the question presented by this case.[3]

More helpful is NMSA 1941, Section 7–115, which required reporting any penal violation committed by a "public official or employee of the state, or of any county, or of any incorporated city, town or village, or of any *municipal, consolidated, union high or rural school district,* or of any drainage or irrigation district, or of any other purely public corporation, board, or office[.]" (Emphasis added.) Because the listed entities do not otherwise appear to overlap, one could reasonably conclude that the legislature viewed an employee of a school district as distinct from an employee of the state. Also of interest is NMRS 1941, Section 10–501, which required periodic reports of all state employees. The various editions of "Officers and Employees of State Departments and Institutions of the State of New Mexico" contain the names of employees of state educational institutions such as the School for the Blind, but do not mention employees of local school districts. *See Officers and Employees of State Departments and Institutions of the State of New Mexico* (1939, 1940, and 1941 editions; Sec'y of State publication).

Perhaps most suggestive of a legislative understanding that "state employees" did not include employees of local school districts is legislation regarding payment of public employees. In 1923 the legislature enacted a statute relating to schools that stated: "The salary per month shall be computed and paid on the basis of the months school is (as) actually taught in the district during the term. All teachers shall be paid monthly." 1923 N.M.Laws, ch. 148, § 1108. In 1933 the legislature enacted a statute stating that "all persons employed by and on behalf of the State of New Mexico" shall receive salary or wages semi-monthly. 1933 N.M.Laws, ch. 157, § 1. Section 4 of that Act provided "[t]hat all Acts or parts of Acts in conflict herewith be and the same are hereby repealed." If the legislature considered teachers in local school districts to be "state employees," then Section 4 would have repealed the 1923 statute. Yet that statute was codified in the 1941 compilation (as Section 55–1104), recodified in the 1953 compilation (as Section 73–12–4), and explicitly repealed by 1967 N.M.Laws, chapter 16, Section 301.

**3.** Other statutes of the day contained similar lists of types of public employees. *E.g.,* NMSA 1941, §§ 10–105 (residency requirement for public employees); 10–409 (eight-hour day); 10–413 (care at Holy Cross Hospital); 41–802 (bribery). So do some of the present-day statutes relied upon by the majority. *E.g.,* NMSA 1978, § 6–16–2 (Repl.Pamp.1988); § 10–1–7 (Repl.Pamp.1990).

d. *Conclusion.*

Although the question is a close one, an examination of the policies behind Sections 2–1–3 and –4, together with a review of legislative usage at the time those sections were enacted, suggests that employees of local school districts probably were not intended to be within the coverage of those statutes. That conclusion is reinforced by an applicable canon of statutory construction. Because NMSA 1978, Section 2–1–5 provides criminal penalties for violation of Section 2–1–3 or Section 2–1–4, they are to be strictly construed, even when applied in a civil context. *See Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *Bokum Resources Corp. v. New Mexico Water Quality Control Comm'n,* 93 N.M. 546, 603 P.2d 285 (1979); *Brown v. Bowling.* Strict construction requires lenity when "a reasonable doubt persists about a statute's intended scope even after resort to 'the language and structure, legislative history, and motivating policies' of the statute." *Moskal v. United States,* — U.S. —, —, 111 S.Ct. 461, 465, 112 L.Ed.2d 449, 458 (1990) (quoting *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (emphasis deleted)). Here, there is much more than a reasonable doubt supporting the more lenient interpretation of Sections 2–1–3 and –4. Therefore, they should be construed as not including employees of local school districts. Perhaps the reality of present-day state control of local school districts creates a need for inclusion of their employees under those provisions, *see* AG Op. No. 75–21 (1975), but that task is for the legislature, not us.

2. Separation of Powers—Article III, Section 1.

I agree with the majority that article III, section 1 of the New Mexico Constitution does not prohibit employees of local school districts from sitting in the legislature. I do not agree, however, with the majority's construction of that section.

Article III, section 1 is our state's separation-of-powers provision. The rationale behind such provisions is that "none of [the branches of government] ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers." A. Hamilton, *The Federalist* No. 48, at 308 (Lodge ed. 1888). Given that purpose, article III, section 1 should be read to prohibit all executive department *employees* from service in the legislature. I do not join the majority in limiting the prohibition to executive department *officers.* A governor seeking control of the legislature could do so by offering legislators positions as *employees* in the executive branch, regardless of whether the jobs are those of executive *officers.*

This is not a mere theoretical concern. Perhaps the most notorious example this century of one branch of state government attempting to control another branch occurred in Louisiana. As summarized in *Saint v. Allen,* 169 La. at 1047–50, 126 So. at 549, fifteen members of the legislature were employed in the state executive department. The Louisiana constitutional separation-of-powers provision was not materially different from New Mexico's. Article II of the constitution stated:

"Section 1. The powers of the government of the State of Louisiana shall be divided into three distinct departments—legislative, executive, and judicial.

"Section 2. No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

*Id.* at 1057, 126 So. at 550. Although the court in *Saint* apparently had before it only three legislators who held the job of attorney for the state highway commission, a position that might conceivably be considered to constitute a public "office," the court made clear that the constitutional provision prohibited any executive employment of state legislators. The court wrote:

[T]he constitutional prohibition is being violated by some of the individual members of the Legislature, by accepting em-

ployment, at fixed salaries, to exercise powers or perform duties belonging to the executive department of the government.

*Id.* at 1064, 126 So. at 554. Later the court stated:

Counsel for appellants argue finally that these three members of the Legislature do not, as employees of the highway commission "exercise power" belonging to the executive department, because they are not officers but only employees of the highway department. The language of article 2 of the Constitution, however, leaves no doubt that it is not a law against dual office holding. It is not necessary, to constitute a violation of the article, that a person should hold office in two departments of government. It is sufficient if he is an officer in one department and at the same time is employed to perform duties, or exercise power, belonging to another department. The words "exercise power," speaking officially, mean perform duties or functions.

*Id.* at 1067, 126 So. at 555.

The opinion in *Saint* was construing the words "exercise power properly belonging to either of the others." We are construing the indistinguishable words "exercise any powers properly belonging to either of the others." *Saint* is persuasive. Not only does it contain a thorough and learned discussion of the theory behind separation-of-powers doctrine; but also it was written in circumstances which provided that court with an opportunity to understand in concrete terms the potential evils of employment of legislators in the executive branch. Given this authority, I am perplexed that *Saint* finds no mention in the majority's opinion.

*Saint* was followed in *State ex rel. Black v. Burch,* 226 Ind. 445, 80 N.E.2d 294 (1948). The court in that case held that the state's constitutional separation-of-powers provision prohibited employment of legislators by executive branch agencies even though the legislators were merely employees and not public officers. The Indiana constitutional provision stated, "[N]o per-

son, charged with official duties under one of these departments [legislative, executive, or judicial], shall exercise any of the functions of another, except as in this Constitution expressly provided." *Id.* at 457, 80 N.E.2d at 299 (emphasis omitted). The use of the word "functions" rather than "powers" (as appears in the New Mexico and Louisiana Constitutions) was immaterial to the court's decision. After approving the *Saint* decision, the court said, "It would seem to us that these two words ['power' and 'function'] are interchangeable, but, if there is any distinction, the term 'functions' would denote a broader field of activities than the word 'power.'" *Id.* 226 Ind. at 463, 80 N.E.2d at 302. The court was not suggesting that it would reach a different result under the Louisiana Constitution; it was merely pointing out that anything prohibited by *Saint* would be prohibited by the Indiana Constitution.

*Monaghan v. School District No. 1, Clackamas County,* 211 Or. 360, 315 P.2d 797 (1957) (en banc), followed *Burch.* Interpreting a provision of the Oregon Constitution identical to Indiana's, it prohibited a legislator from being employed as a school teacher. Despite the court's statement that "functions" is a broader term than "power," *id.* at 370, 315 P.2d at 803, it did not suggest that it would have reached a different result if the word "power" had been used. *See Jenkins v. Bishop,* 589 P.2d at 773 (Ellett, C.J., concurring and dissenting) (agreeing with the reasoning in *Monaghan*). *Cf. Stolberg v. Caldwell,* 175 Conn. 586, 402 A.2d 763 (1978) (legislator cannot serve on faculty of state college because of constitutional prohibition against legislator's accepting "any appointive position or office" in executive department of the state government), *cert. dismissed sub nom., Stolberg v. Davidson,* 454 U.S. 958, 102 S.Ct. 496, 70 L.Ed.2d 374 (1981).

Although *State ex rel. Barney v. Hawkins,* 79 Mont. 506, 257 P. 411 (1927), supports the position taken by the majority regarding the interpretation of article III, section 1, that opinion is unpersuasive. It does not discuss the purpose of separation-

of-powers doctrine or why a legislator is barred only from holding an executive *office*. The court's analysis consists of merely announcing its conclusion that one who is not an officer "has no power in connection with his position, and is not exercising any powers belonging to the executive or judicial department of the state government." *Id.* at 514, 257 P. at 413. The opinion has a useful discussion of the meaning of "public office," for which it has been cited by a number of courts, *e.g.*, *State v. Quinn*, 35 N.M. 62, 64–65, 290 P. 786, 787 (1930), but the meaning of "public office" is not disputed in this case.

*Ruiz v. State*, 540 S.W.2d 809 (Tex.Ct. App.1976), cited by the appellees, also is unpersuasive. The issue decided by that court was whether a teacher (who also served as a justice of the peace) was a member of the executive branch.

Nevertheless, article III, section 1 does not apply to employees of local school districts. Even though legislators may not be employed by the executive branch of state government, the question remains whether an employee of a local school district is an employee of the executive branch of state government for the purposes of article III, section 1. I think not.

As stated above, the purpose of a separation-of-powers provision is to prevent one branch of government from acquiring excessive control over another. The reason to prohibit legislators from being employed by the executive branch is to prevent the executive from gaining control over the legislature by employing its members. That risk is remote in the circumstances of this case. School districts are managed, except in exceptional circumstances, NMSA 1978, Section 22-2-14 (Repl.Pamp.1989) (power of state board to suspend local school board), by locally elected school boards. In particular, local school boards have responsibility for hiring employees of the district. Even if state regulation may preclude the board from hiring certain individuals, that is far different from empowering the state executive to hire employees of the district.

At oral argument the state contended that this view of separation-of-powers doctrine was too narrow—that another purpose of the doctrine is to prevent individual public officials and employees from having personal conflicts of interest. To be sure, separation-of-powers provisions prohibit certain conflicts of interest. But my reading of pertinent authority on the purposes of separation of powers, particularly the discussion in the *Federalist,* convinces me that prevention of such personal conflicts is an adventitious result of the separation-of-powers doctrine rather than a core concern. The purpose of the doctrine is to prevent one branch of government from dominating another, not preventing a person from advancing self-interest through having positions in more than one branch.

Moreover, when article III, section 1 of the New Mexico Constitution speaks of three departments of state government, it refers to specifically defined entities, none of which encompasses local school districts. Article III, entitled "Distribution of Powers," is composed only of section 1, which states that the "powers of the government of this state are divided into three distinct departments," and prohibits a person who exercises the powers of one from exercising the powers belonging to either of the others. Then article IV, section 1 states where the legislative power is vested; article V, section 1 states what the executive department consists of; and article VI, section 1 states where the judicial power of the state is vested. Article V, section 1 states: "The executive department shall consist of a governor, lieutenant governor, secretary of state, state auditor, state treasurer, attorney general and commissioner of public lands[.]" The executive department also necessarily includes the direct subordinates of those officials. Perhaps for other purposes the executive branch of state government would include additional persons; after all, one usually thinks of everyone in state government as belonging to one branch or another. *See Saint v. Allen,* 169 La. at 1067, 126 So. at 555; *Stolberg v. Caldwell,* 175 Conn. at 601–604, 402 A.2d at 771–72 (considering contention that state colleges are not within one of the

three branches of state government). Nevertheless, the structure of the New Mexico Constitution makes it apparent that article III, section 1 refers only to the executive department described in article V. None of the officials listed as constituting the executive department has the power to hire or directly supervise employees of local school districts.

Therefore, based on the objectives of separation-of-powers doctrine and the language of the New Mexico Constitution, I would hold that for the purposes of article III, section 1, employees of local school districts are not employed by the state executive department.

3. Are the Employment Contracts in Violation of Article IV, Section 28?

I agree with the majority that *State ex rel. Baca v. Otero*, 33 N.M. 310, 267 P. 68 (1928) compels the conclusion that an appropriations bill in itself does not "authorize" a contract of employment with the state within the meaning of article IV, section 28. That conclusion disposes of the contention that Mr. Hocevar's contract violated section 28.

As for Ms. Casey, I believe that her contract escapes the constitutional ban because it would have been authorized by legislation in effect prior to the 1986 amendment to NMSA 1978, Section 22–10–11(B)(5) (Repl.Pamp.1989). John Wells correctly read *State ex rel. Maryland Cas. Co. v. State Highway Comm'n*, 38 N.M. 482, 35 P.2d 308 (1934) in his Comment, *Legislative Bodies—Conflict of Interest—Legislators Prohibited from Contracting with State*, 7 Nat.Res.J. 296 (1967). From that opinion he distilled as the test for compliance with section 28: "whether the contract could have been entered into by the state if the act in question had not been passed." *Id.* at 302.

It is unnecessary for us to decide whether the Hocevar and Casey contracts were contracts "with the state or any municipality thereof" within the meaning of article IV, section 28.

4. Casey's Complaint—Did it Present an "Actual Controversy"?

Whether an actual controversy is presented by issuance of an opinion by the attorney general must be decided on a case-by-case basis. "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree[.]" *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). The district court must exercise its judgment as to whether the issue is sufficiently ripe—whether the issue has taken concrete form with parties on either side who have a real interest in the outcome. *See id.* Because the attorney general filed suit in Bernalillo County so soon after Casey filed her original complaint, I fail to see how we could find that Casey's allegation of an actual controversy was too theoretical. The prediction in her complaint was not only reasonable, but proved true. *Cf. Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (jurisdiction under Declaratory Judgment Act depends upon whether controversy still exists at time of hearing on the issue).